Gabba v. DAAT, Inc. et al, No. 842-11-09 Wncv (Toor, J., Nov. 25, 2013)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
WASHINGTON UNIT
CIVIL DIVISION

| | |
|---|---|
| ANIL GABBA<br>  Plaintiff<br><br>v.<br><br><br>DAAT, INC., DIPENDER SINGH, and<br>AMRINDER PAL TIWANA<br>  Defendants | Docket No. 842-11-09 Wncv |

RULING ON THE MERITS

This foreclosure case involves a dispute over the purchase and sale of a motel in Barre. Plaintiff seeks to foreclose upon a mortgage given by Defendant DAAT (and a note guaranteed by the other defendants) in connection with that sale. Defendants counterclaimed, asserting common law fraud and consumer fraud, as well as seeking to evict Gabba from the premises. Gabba is no longer at the premises, but Defendants assert a claim for unpaid rents. A court trial was held on October 9 and 10, 2013. Plaintiff is represented by Melvin B. Neisner, Jr., Esq.; Defendants are represented by Richard L. Brock, Esq.

Findings of Fact

The court finds the following facts established by a preponderance of the evidence. In 2003, Plaintiff Gabba purchased the Budget Inn in Barre, a 24 room motel with three attached apartments. He and his son, then a high school student, lived there and operated it for two years. Gabba and Singh had been friends for a number of years, both being natives of India and sharing some mutual friends in this country. They both owned motels and at times conferred about their

businesses, as well as visiting each other on occasion. In 2005, Gabba wanted to return to India to deal with some family matters and offered to sell the motel to Singh.

In September 2005 the parties signed a purchase and sale agreement (PSA) for $675,000, with a deposit of $25,000. Ex 1. Closing was to occur by November 1. When Singh signed the PSA he relied solely upon one sheet of paper that Gabba prepared for him summarizing the income and expenses for 2004. Ex. A.  Singh did not look at the books or verify any of the information. He merely looked at a few rooms on a walk-through with Gabba. He did not review any tax returns.[1] The income and expense sheet showed income of roughly $165,000 and expenses of roughly $81,000. It showed no expenses for salaries or other employee-related expenses such as payroll taxes. Singh did ask if there were any significant issues with the building that would require repairs and was told there were not. However, he did not hire a building inspector.

In November 2005, the closing was delayed because Singh was unable to get the financing he needed to close. Gabba said he would delay closing and let Singh start leasing the motel if Singh could come up with a bigger deposit to allow Gabba to deal with some family issues in India.  Singh agreed to increase his deposit by $100,000. On November 15 the parties signed an addendum to the PSA extending the closing date to February 15, 2006 and increasing the down payment to a total of $125,000. Ex. 2. The addendum gave Singh the right to demand return of the full $125,000 if the closing did not take place.

On November 15 the parties also signed a lease agreement by which Singh would pay $6,500 a month for three months, which would be extended as a month-to-month lease if closing

---

[1] Although the PSA says they were being provided, they were not. Prior to the 2007 purchase, Gabba did give Singh a copy of a 2004 tax return, which was consistent with the income and expense figures Gabba had previously provided. It showed receipts of $167,000 in 2004. The tax return also showed no payroll expenses. There was no evidence that the return was ever filed with the taxing authorities.

was delayed. Ex. 3. The lease divided responsibilities for repairs and maintenance so that the roof, foundation, and exterior walls were Gabba's responsibility with the rest being allocated to Singh. Singh began operating the motel under the lease. When Singh began running the motel he found barely any records in the office. No ledger, no tax returns, no checkbook records.

Gabba left for India in November 2005. When he returned here, however, he stayed at the motel. He claims he merely visited Singh and stayed in Singh's apartment in the motel, but the evidence clearly established that Gabba's son continued to live in the motel until he finished high school in 2009. The court finds that Gabba stayed with his son when he was in town, not with Singh. Singh and Gabba remained friends, and would have dinner and drinks together when Gabba was in town.

As it turned out, the motel did not bring in the kind of money Singh was expecting. Gabba had projected revenues of $180,000 for 2005, based upon what he thought he could do over and above Gabba's $165,000 income for 2004. Instead, income was merely $135,000: $30,000 less than Gabba had reported for 2004. When Singh told Gabba this, Gabba said either Singh was not running things right or he had just had a bad year.

In fact, that $30,000 mismatch is explained by the payroll expenses that Gabba had failed to disclose. Gabba testified that he had no employees at the motel, but the court finds that entirely lacking in credibility. Instead, the court accepts as credible the testimony of Bernadeth Weeraratna that she and her husband were employed at the motel by Gabba from 2003 though June of 2005. Her husband's nickname was "Leslie." They were paid $1,400 a month, all in cash, and they were given a free apartment to live in, valued at $1,200. The couple did office work, room cleaning, housekeeping and laundry. Gabba paid no payroll taxes for them, and they later became involved in a dispute with Gabba over their pay before the Department of Labor.

Moreover, records from the time Gabba ran the motel show an employee signing receipts in the name of "Leslie." His wife identified the signatures as authentic. At least one document shows Leslie's title as "housekeeper." Ex. J. The court finds that the pay and rent for the employees totaled $31,200 per year.[2]

It also turned out that the building was not in as good shape as Gabba had represented. Shortly after starting the lease in 2005, Singh learned that the boiler was "dying." That had to be replaced. Singh also had to add a second hot water heater because there was insufficient hot water for all the people in the building. The roof also began leaking into various rooms and a portion of it had to be replaced that first year, as did portions of the exterior walls that were damaged by the leaking. The roof was in such bad condition that it appeared to have been an issue for years. The lease placed the roof and walls on Gabba's list of responsibilities. However, because he was in India dealing with family matters, Singh did not ask Gabba to fix them. The amount Singh paid for the roof and walls was about $17,000.Ex. K. All of this occurred before Singh bought the property.

Given these problems, Singh asked for his $125,000 deposit back and said he wanted out of the deal. However, Gabba said he could not get the money, as he had invested it in property in India and then the market had crashed and it was no longer worth that. Singh decided his best choice was to proceed with the purchase, since otherwise he thought he would lose the deposit.

In July 2007 the parties agreed to a lower purchase price: $660,000 instead of $675,000. Exs. 6 and 7. The reduction in price was negotiated based upon what the parties calculated had been paid down on the mortgage during the period Singh had been renting the property. The

---

[2] Gabba points to his tax returns showing the same sort of income that he reported to Singh, and argues that it would be illogical for him to file tax returns that reported more income than he really had. The flaw in that argument is that there was no evidence that the tax returns presented to Singh were actually filed with the IRS. They may have been prepared solely to show Singh, and never filed.

buyer was now Singh's company, DAAT, Inc. Both parties were represented by counsel in the transaction. They closed on July 30, 2007. Ex. 8. A portion of the price was paid though financing not at issue here. However, Gabba took back a note and mortgage for $60,000. Exs. 8, 11, 12. Singh and his wife were guarantors on the note. The deal was that there would be no interest on the note for two years. In that two year period (until July 30, 2009), Gabba had the right to use an apartment at the motel for no cost. That was the exchange for no interest on the note. Singh did not ask at the time of closing to be reimbursed for any of the repairs he had done at the motel during the period he leased the property.

When the two years expired on July 30, 2009 and the $60,000 was not paid, this lawsuit to foreclose on the property ensued. Gabba seeks interest of $30,220.27 running from July 2009, as well as costs and attorney's fees totaling $14,732.14. The note provides for fees and costs if collection action is taken.

The rental value of the apartment Gabba had for free for two years was $1,200 a month. In July 2009, Gabba and his son moved the son to Indiana to attend Purdue University. However, they left a number of items in the apartment: clothing, kitchen equipment, and furniture. The furniture actually belonged to the motel, but clearly the personal items did not. The son left his key with the housekeeper when he left in July 2009, but Gabba never turned in *his* key, advised Singh that *he* was vacating, or said that he did not want any of the personal property left in the apartment. Gabba also continued to receive mail at the motel. The housekeeper testified credibly that he came back and used the apartment on occasion, as recently as late summer of 2010.

In September of 2009, Singh's counsel made a written demand for rent of $1,200 a month from August 2009 forward. Ex. 15. It was not until November 2010, after this lawsuit began, that Gabba responded. Gabba's attorney at that time advised Singh's attorney that Gabba did not

5

want any of the property left in the apartment, and Singh moved it all to a pallet in the basement, where it remains. Singh seeks the value of the apartment for the sixteen months it was not rented after July 2009, for a total of $19,200. It was rented out as of December 2010 for $1,200 a month.

After the lawsuit began, Singh became suspicious that Gabba had misled him. Specifically, when he obtained banking records he saw large deposits and transfers from other accounts into the motel accounts. Ex. E. When various "suspicious" transfers are subtracted the income is closer to the $135,000 that Singh experienced. Prior to the trial, Judge Bent sanctioned Gabba for noncompliance with discovery orders by barring him from presenting any evidence to explain "the questionable deposits, including their source, or the employment or lack of employment of Leslie Weeraratne." Decision re: Defendants' Motion in Limine at 3 (June 25, 2013). Given that limitation, the court cannot reach any conclusions as to the source of the various transfers. Although fraud is one possibility, it is equally possible that Gabba, like many individuals and businesses, moved funds among accounts to make payments on time based upon cash flow.

Singh estimates that the actual value of the motel at the time he bought it was $500,000 rather than $660,000, based upon the revenue stream and the repairs that had to be made.

## Conclusions of Law

The issues before the court are whether Gabba is entitled to foreclosure and any deficiency judgment based upon non-payment of the $60,000 note, whether Gabba committed common law fraud or consumer fraud, and whether Singh is entitled to rent from Gabba.

### 1. The Note

The first issue, as to whether Defendants paid the $60,000, is undisputed. They did not. However, the court concludes that foreclosure would be unjust for the reasons stated below. Instead, Gabba will be awarded $60,000 in damages, plus interest from the date payment was due on the note.

### 2. The Counterclaims for Fraud

#### a. Statute of Limitations

Before addressing the merits of the fraud claims the court must address Gabba's argument that they are barred by the statute of limitations. Gabba asserts that a three year statute of limitations applies, but cites no authority for that proposition. The Vermont Supreme Court has expressly stated that common law fraud claims are "subject to the general six-year statute of limitations for civil actions." Estate of Alden v. Dee, 2011 VT 64, ¶ 30, 190 Vt. 401.[3] Likewise, although not addressing a contested issue on the matter, more than one opinion has noted that there was no dispute between the parties that the six-year period applies to consumer fraud claims. *See*, Kaplan v. Morgan Stanley & Co., Inc., 2009 VT 78, ¶ 7,186 Vt. 605 (mem.); Galfetti v. Berg, Carmolli & Kent Real Estate Corp., 171 Vt. 523, 524 (2000). Nor has Plaintiff pointed to any reason why there would be different limitations periods for statutory and common law fraud claims. The court concludes that a six-year period applies to both.

The counterclaims were asserted in April of 2010 and related to acts going back to 2005. They were therefore timely.

---

[3] Plaintiff's counsel had an obligation to acknowledge the existence of this case squarely on point. V.R.C.P. 11(b)(2). His failure to do so is concerning. A repeat performance of this nature may lead to further action by the court.

b. Common Law Fraud

"The essential elements of a fraud claim are (1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party acts in reliance on that fact; and (5) is thereby harmed." Alden, 2011 VT 64, ¶ 32. The court concludes that the clear and convincing evidence establishes that Gabba knowingly and intentionally misled Singh and his business, DAAT (the actual purchaser) by concealing the full extent of the expenses of running the motel. Gabba knew he had two employees working for him and he failed to disclose that fact. Instead, Gabba created a false income and expense summary that showed zero employee costs. Gabba led Singh to believe that all the work was done by Gabba and his son. In truth, the employees were paid $1,400 a month and had free rent worth $1,200 a month. Thus, that $31,200 per year was unaccounted for in the expenses that Gabba provided to Singh.

It is impossible to conclude that this was anything other than knowing and intentional fraud in an attempt to make the motel's value look higher. It is also undisputed that Singh acted in reliance upon the income and expense figures that Gabba gave him, and that DAAT was harmed as a result. The harder question here is whether the information was "open to the defrauded party's knowledge."

Vermont law is somewhat confusing on exactly what this phrase means. How much investigation must a buyer do? "A central element of a fraud claim is that a misrepresentation be made as to a material fact, knowledge of which would be 'otherwise . . . unavailable to the purchasers *in the exercise of their due diligence*.'" Lewis v. Cohen., 157 Vt. 564, 569 (1991)(emphasis added), quoting Cheever v. Albro, 138 Vt. 566, 572 (1980). This places some burden upon a buyer to investigate. Where "it is clear from the full text of a representation or

from facts about the relationship of the parties that reliance should only follow an independent inquiry, then [the buyer] will be held to such an investigation." Lewis, 157 Vt. at 569 (internal quotations omitted).

There is, however, a longstanding and apparently contrary principle in Vermont law that once fraudulent misrepresentation or concealment has been shown, by which a party "has been induced to enter into a contract, it is no excuse for, nor does it lie in the mouth of, the [misrepresenting party] to say that the [victim] might, but for his own neglect, have discovered the wrong and prevented its accomplishment." Maidment v. Frazier, 90 Vt. 520, 527 (1916); *see also* Sutfin v. Southworth, 149 Vt. 67, 70 (1987)(same); Kendall v. Wilson, 41 Vt. 567, 571(1869) (even if seller's claim to be selling a perpetual motion machine was outlandish, "the law will afford relief even to the simple and credulous who have been duped by art and falsehood"); Chamberlin v. Fuller, 59 Vt. 247, 256 (1887) ("No rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.").

How these two doctrines intertwine is unclear.[4] *See, e.g*., Silva v. Stevens, 156 Vt. 94, 105 (1991) (holding that "negligence on the part of plaintiffs is not an absolute defense to fraudulent misrepresentation" but also that "where it is clear from the full text of a representation or from facts about the relationship of the parties that reliance should only follow an independent

---

[4] It is not just Vermont that appears to have some conflicting principles in this regard. *See, e.g*., 21 Tenn. Prac., Contract Law and Practice § 6:27 (Westlaw though Aug. 2013)("Where the defendant shows the victim's unreasonable reliance, and where the parties deal on equal terms, Tennessee decisions conflict on whether the wrongdoer may retain the benefit of its deceitful bargain. . . . The better view is that the recipient's fault in failing to know or discover facts does not make reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing. This majority view states the better position, because in determining where the loss should lie, courts should focus on deterring trickery versus penalizing the victim for its possible foolishness. On the other hand, it is difficult to reconcile the recommended view with the strict legal principle that where the party has notice or knowledge of the underlying facts, it cannot justifiably claim deception or fraud by the other party."); Fraudulent Representations Inducing the Purchase of a Small Business, 30 Am Jur. Proof of Facts 3d 1, § 7 (Westlaw though Nov. 2013) (noting that it appears "no issue relevant to fraud is litigated more than the duty to investigate as a condition for establishing reasonable reliance. There is a recognized split on this issue.")

9

inquiry, such an inquiry must be made")(internal quotation omitted). The two principles can perhaps be tied together as follows:

> [T]he rule that fraud cannot be predicated on a failure to disclose facts where the information is as accessible to one party as to the other, and where the truth may be ascertained by the exercise of reasonable diligence, does not justify a resort to active deceit or fraud and hence does not apply where a party, in addition to nondisclosure, uses any artifice to throw the other party off his or her guard and to lull that party into a false security.

37 Am. Jur. 2d Fraud and Deceit § 225 (Westlaw through Nov. 2013); *see also*, M.L. Cross, False Representations as to Income, Profits, or Productivity of Property as Fraud, 27 A.L.R. 2d 14, § 6 ("There is a broad general rule in most jurisdictions that one to whom a positive, distinct, and definite representation concerning an existing fact has been made is entitled to rely on it and need not make inquiry concerning the particular facts involved."); Scroggins v. Worthy, 316 P. 2d 480, 482 (Wash. 1957)("[C]aveat emptor does not apply to a misrepresentation of a material fact made for the purpose of inducing a sale.").

In other words, where there has been an affirmative misrepresentation, rather than a mere omission, the misrepresenting party may not say "you could have found out I was lying." The Restatement of Torts declares, "[t]he recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." Restatement (Second) of Torts § 540 (1977). As noted in the treatise cited in the footnote above, "in determining where the loss should lie, courts should focus on deterring trickery versus penalizing the victim for its possible foolishness." 21 Tenn. Prac., Contract Law and Practice § 6:27. Thus, it appears that the duty to investigate may not apply in the case of an express affirmative misrepresentation.

However, even if Gabba's presentation of false documents to Singh with regard to income and expenses were not enough as a matter of law to eliminate any duty to investigate, the

court concludes that Singh had no such burden on the facts of this case. "What constitutes due diligence must be weighed against the facts of each case." White v. Pepin, 151 Vt. 413, 420 (1989). Although one could certainly argue that any reasonable buyer of a motel would be suspicious of the claim that there were no paid employees, the evidence is that Gabba paid no payroll taxes, paid the employees in cash, and apparently kept no books for the motel. Thus, it is unclear what due diligence Singh could have done that would have provided him with any useful information. *See* False Representations, supra, 27 A.L. R. 2d 14, § 7 ("Where the buyer would not have been able to discover the truth concerning rents, profits or income even if he had made a personal investigation, his failure to investigate does not preclude him from recovering for fraud."). Singh could perhaps have spied upon the motel to see whether anyone was working there at times when Gabba and his son were not, but due diligence can hardly include such spying. Moreover, this was a deal between friends. It was not the sort of situation in which suspicion and spying would be logical steps. *Accord*, Jensvold v. Town & Country Motors, Inc., 162 Vt. 580, 586 (1994) (buyer had no duty to investigate whether used car was molded from two damaged cars, as such fraud is rare in Vermont and buyer had "no reason to believe [the seller] would sell him" such a vehicle). Nor was there any evidence that Singh had reason to know that there must have been additional employees beyond the family members.

Thus, the court concludes that DAAT has proved by clear and convincing evidence that Gabba engaged in common law fraud in the sale of the motel. As a result, DAAT paid more than the motel was worth. The only evidence of what its true worth was came from Singh's testimony about how motels are valued, which the court found credible. Based upon that testimony the court finds the true value of the motel at the time of sale was $500,000 rather than $660,000. Thus, the court will award DAAT $160,000 in damages. The court declines to award any

additional damages for the repairs that should have been paid for by Gabba under the lease, because no demand was ever made upon him to make the repairs.

Consumer Fraud

To prove consumer fraud, "(1) there must be a representation, practice, or omission likely to mislead the consumer; (2) the consumer must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be 'material,' that is, likely to affect the consumer's conduct or decision with regard to a product." First Quality Carpets, Inc. v. Kirschbaum, 2012 VT 41, ¶ 19, 192 Vt. 28 (citation omitted). All of these elements are met for the reasons addressed in the discussion of common law fraud. The false income and expense statement was a representation, it was likely to mislead any potential buyer of the motel, it was reasonable to interpret it as suggesting that the profits were higher than they actually were, and the amount of profit is perhaps the most material fact a business owner would consider in deciding to buy a business. Thus, consumer fraud by Gabba has been established.

DAAT cannot recover twice for the same damages, and the court finds those resulting from the consumer fraud are identical to the damages suffered as a result of the common law fraud. However, under the Consumer Fraud Act (now entitled the Consumer Protection Act), the successful consumer is entitled to attorney's fees. The court will therefore award DAAT its reasonable attorney's fees.

In addition, because Gabba's fraud was intentional and knowing, and done for personal gain with a full understanding that he was causing a friend to suffer financially, the court finds that exemplary damages are justified. Follo v. Florindo, 2009 VT 11, ¶ 46, 185 Vt. 390 ("actual common-law fraud, as opposed to other kinds of intentional torts, inherently possesses the necessary malice and ill will that may make punitive damages appropriate"); Proctor Trust Co. v.

12

Upper Valley Press, Inc., 137 Vt. 346, 354 (1979)("[a]ctual fraud is accomplished with an evil intent"); Monahan v. GMAC Mortgage Co., 2005 VT 110, ¶ 66, 179 Vt. 167 ("fraudulent conduct can satisfy the actual malice requirement for punitive damages"). The court will award exemplary damages of $80,000, or one half of the damage award.

The Counterclaim for Rent

The court concludes that Gabba did overstay his entitlement to the apartment, which ended in mid-July 2009, failed to pay any rent, and failed to vacate it until November 2010 when he gave notice of abandonment through counsel. The owner of property "is entitled to relief based on [another]'s occupation of the premises, even though he is not entitled to back rent where no rental agreement existed." Kellogg v. Shushereba, 2013 VT 76, ¶ 21. The value of the apartment was $1,200 per month, so the fair value of his occupancy for August 2009 through November 2011 totals $19,200, plus prejudgment interest of 12% from September 2009 – the date of demand for the rent.

Order

1. Gabba is awarded $60,0000 from DAAT, Singh, and Tiwana jointly for their failure to pay on the note when due, plus interest at 12% from July 30, 2009.

2. DAAT is awarded the value of rent for the apartment from August 2009 through November 2010, a total of $19,200, plus interest at 12% from September 2009.

3. Gabba may recover the personal property that he left in the motel (now in the basement) if he collects it within thirty days, at a time agreed to through the lawyers. If he does not so collect it, it shall become DAAT's property.

4. DAAT is awarded $160,000 in damages for fraud by Gabba, with prejudgment interest of 12% from July 30, 2007.

5. DAAT is awarded $80,000 in exemplary damages.

6. Gabba is entitled to his attorney's fees for collecting on the note.

7. DAAT is entitled to its attorney's fees for litigating the consumer fraud claim.

8. The parties are directed to negotiate and attempt to reach agreement on the wording of a final judgment, as well as an agreement with regard to the fee awards. If they are unable to do so, then Defendants shall submit by December 9 both their response to Plaintiff's motion for fees and DAAT's motion for fees; Plaintiff shall respond to DAAT's motion by December 19. Each party shall also submit with their filings their proposed wording for the judgment order reflecting the court's rulings above, including their calculations of interest.

Dated at Montpelier this 25th day of November, 2013.

_____
Helen M. Toor
Superior Court Judge