2012 VT 41

# First Quality Carpets, Inc. v. Warren Kirschbaum and Wynne Kirschbaum

[54 A.3d 465]

No. 10-312

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 17, 2012
Motion for Reargument Denied July 2, 2012

---

*W. Owen Jenkins* of *W. Owen Jenkins, P.C.*, Essex Junction, for Plaintiff-Appellee.

*Thomas C. Nuovo* of *Bauer, Gravel, Farnham, Nuovo & Parker*, Burlington, for Defendants-Appellants.

¶ 1. **Burgess, J.** Appellants Warren and Wynne Kirschbaum (the Kirschbaums) appeal the ruling of the Chittenden Civil Division in favor of appellee First Quality Carpets, Inc. (First Quality) in a dispute over carpet installed in 2007. The Kirschbaums argue that the civil division erred in awarding First Quality attorney's fees under 9 V.S.A. § 4007(c) of the Prompt Pay Act because that section of the statute authorizing attorney's fees recovery effec-

tively expired in 1996 pursuant to a sunset provision included in the Act. Alternatively, the Kirschbaums argue that because they withheld payment to First Quality in good faith, they were entitled to a directed verdict and that First Quality should not have been awarded attorney's fees under § 4007(c). Finally, the Kirschbaums argue that the court erred in denying their counterclaim under the Consumer Fraud Act. We affirm in all respects.

¶ 2. The trial court's findings are summarized as follows. In July 2007, the Kirschbaums bought carpeting and tile from First Quality and hired First Quality to install the carpet in their home. Contrary to the common practice of requiring full payment at the time of sale, First Quality agreed to accept payment in three parts: the first at the time of sale, the second when the carpet arrived from the manufacturer, and the third after it was installed. According to this agreement, the Kirschbaums paid First Quality $4867 at the time of sale. First Quality's salesman explained to the Kirschbaums that the carpet carried a 120-day warranty, under which the Kirschbaums "could decide [they] did not want the carpet for any reason at all and [First Quality] would take it out and reinstall different carpet for no charge." First Quality's salesman took measurements and prepared for installation of the carpet, and the Kirschbaums made their initial payment on July 9 with an American Express card.

¶ 3. On August 2, the carpet arrived from the manufacturer, Mohawk, and the Kirschbaums made their second payment, again using American Express. First Quality's owner, William George Woltjen, Jr., inspected the carpet prior to installation, which began on August 8. On August 9, the second roll of carpet to be installed was found by First Quality to be defective. First Quality contacted Mohawk, which advised First Quality to return the defective carpet and that Mohawk would send replacement carpet by August 25. Upon learning of this delay, the Kirschbaums were irate but, after being shown the defective carpet, insisted that First Quality install the defective carpet as planned so that the installation would be completed before a bar mitzvah at their home scheduled for September 8.

¶ 4. Contrary to their policy of not installing a defective product and after initially refusing to do so, First Quality agreed to proceed with the installation as requested, on the condition that it replace the defective carpet with the new carpet once it arrived. First Quality agreed to this arrangement to please the Kirsch-

baums at an added cost of $1700 to itself. On August 13 and 14, First Quality installed the defective carpet, but not to the Kirschbaums' satisfaction. On August 13, Mrs. Kirschbaum called Mr. Woltjen to complain that seams were visible in the carpeting, as a result, in her mind, of poor installation on First Quality's part. Mr. Woltjen disputed this assertion, responding that the carpet's installation was fine and that if there were visible seams, it was the result of the type of carpet chosen by the Kirschbaums and could not be helped. Mr. Woltjen reiterated that the carpet had the 120-day warranty and informed Mrs. Kirschbaum that the carpeting carried with it a lifetime warranty against any seam defects. Opting not to invoke the warranty, the Kirschbaums nevertheless proceeded on August 14 to contact American Express to dispute their first two payments for the carpeting, falsely claiming that they had "not received the order."

¶ 5. The dispute between the Kirschbaums and First Quality escalated after the previously ordered replacement carpeting arrived on September 14. After cutting the new carpet to fit the Kirschbaums' home, First Quality sought to schedule the removal and replacement of the defective carpeting. Mr. Kirschbaum asked if, instead, they could keep the original carpeting and receive a credit in place of the replacement. When Mr. Woltjen said no on account of the new carpet having already been cut — foreclosing the possibility of its return to Mohawk — the Kirschbaums balked at scheduling installation of the replacement carpet.

¶ 6. The Kirschbaums neither scheduled installation of the new carpet, nor made final payment under their agreement with First Quality, but they did file a new complaint with American Express, falsely alleging that their credit card charges were unauthorized. On December 4, 2007, American Express reversed and deducted the two carpeting charges from First Quality's account totaling $9734. Mohawk then hired Green Mountain Flooring Inspections to examine the carpeting in the Kirschbaums' home. The inspector identified various issues with the carpeting, including visible seams and shade variations that were due to manufacturing defects and not the result of poor installation. He also found one 3/16-inch gap where no seam sealer had been used, an apparent installation defect. These seam issues could have been fixed using various methods, or possibly could have gone away over time, but the inspector agreed that no seam can be made invisible and said that different carpets show seams differently.

¶ 7. In August 2008, First Quality filed a complaint in the Chittenden Civil Division seeking full payment for the installed carpet, interest and attorney's fees under the Prompt Pay Act. It also asserted claims for unjust enrichment and quantum meruit.[1] The Kirschbaums counterclaimed, alleging consumer fraud, breach of contract, breach of the duty of good faith and fair dealing, breach of express warranty, and breach of implied warranty. They also claimed a right to return the carpet pursuant to 9A V.S.A. § 2-714 and sought their legal fees under the Consumer Fraud Act.

¶ 8. The court held a bench trial on May 6, 2010. At the close of First Quality's case, the Kirschbaums moved for a directed verdict on First Quality's claim under the Prompt Pay Act on the basis that they had a good faith basis to withhold payment for the carpet. The court reserved ruling on the motion, and, on the basis of the foregoing facts, ultimately ruled in favor of First Quality on its Prompt Pay Act claim. The court specifically concluded that the Kirschbaums "had no good faith basis on which to cancel the earlier [two] payments" for the installed carpet — totaling $9734 — and therefore that First Quality was entitled to those payments, plus interest. The court further held that First Quality was not entitled to the final payment because that payment was contingent on the ill-fated installation of the replacement carpet, which never took place. It also awarded First Quality, as the substantially prevailing party, attorney's fees under § 4007(c). Finally, the court rejected the Kirschbaums' consumer fraud claim, finding that First Quality made no misrepresentations and did not mislead the Kirschbaums. The Kirschbaums appealed.

¶ 9. The Kirschbaums argue first that it was error to award attorney's fees under § 4007(c) because that statute was not in effect at the time of their transaction with First Quality. When enacted, § 4007(c) included language that it would expire, or "sunset," five years after its passage on June 30, 1996. See 1991, No. 74, § 2. Later, the Legislature decided to repeal the sunset provision, so called, by removing that provision from the statute. The deletion was approved in April 1996, more than two months in advance of the sunset date. See 1995, No. 66 (Adj. Sess.), § 1. The Legislature's intended repeal was silent, however, as to when it would take effect. *Id.*

---

[1] There was also a dispute over the payment for the tiling which the trial court dispensed with and which is not the subject of this appeal.

¶ 10. In part echoing Judge Zonay's dissent in *Burton v. Jeremiah Beach Parker Restoration & Constr. Mgmt. Corp.*, 2010 VT 55, ¶¶ 23-25, 188 Vt. 583, 6 A.3d 38 (mem.) (Zonay, Spec. Ass. J., dissenting), the Kirschbaums argue that this omission could not but doom § 4007(c). By operation of another statute, contend the Kirschbaums, the Legislature's failure to declare an effective date of enactment triggered the statutory default date of July imposed by Title 1, chapter 3 governing "construction of statutes." See 1 V.S.A. § 212 (declaring that new enactments "shall take effect on July 1 next following the date of their passage, unless it is otherwise specifically provided"). The Kirschbaums insist that § 4007(c) expired by its own terms as the clocks tolled the end of June 30, before the repeal's effective date of July 1. Thus, runs their argument, the sun had set on § 4007(c), and it was gone the day before the repeal of its sunset could be realized. The Kirschbaums further assert that the companion statutory prohibition on retroactive revival of an already repealed act, 1 V.S.A. § 214, finalizes the extinction of § 4007(c) unless affirmatively reenacted by the Legislature. The crux, therefore, is whether § 4007(c) survived the application of §§ 212 and 214. We hold that the July 1 default date of § 212 cannot apply to invalidate the Legislature's intent to accomplish exactly the opposite as expressed in its repeal of the sunset provision. Nor does the § 214 prohibition against ex post facto reanimation of expired legislation apply to the alteration of a statute if passed before the affected statute has expired, as with the Legislature's repeal of the sunset in this case. Thus, in accordance with the Legislature's explicit and undisputed intention, § 4007(c) remained in effect after June 30, 1996.

¶ 11. As an issue of statutory construction, we undertake to determine the survival of § 4007(c) de novo.[2] *In re Vill. Assocs. Act 250 Land Use Permit*, 2010 VT 42A, ¶ 7, 188 Vt. 113, 998 A.2d 712. While § 212 would seem to impose an effective date of July 1, 1996 for the sunset's repeal, an instant too late to accomplish its purpose, that section is not a statutory island and must be read in concert with its companion statutes concerning statutory construction in chapter 3 of Title 1. It must also be read in light of this Court's primary obligation in interpreting statutes to

---

[2] The issue of the continued validity of § 4007(c) reared its head, but was not decided, in *Burton*, for lack of preservation. 2010 VT 55, ¶ 5.

effectuate legislative intent. *In re Route 103 Quarry*, 2007 VT 66, ¶ 4, 182 Vt. 569, 933 A.2d 189 (mem.).

¶ 12. Chapter 3 of Title 1 expresses the overarching principle for interpreting the provisions that follow: "In the construction of statutes the rules set out in this chapter shall be observed, *unless such construction is inconsistent with the manifest intent of the general assembly* or repugnant to the context of the same statute." 1 V.S.A. § 101 (emphasis added). Here, there is no dispute that the Legislature intended to cancel the sunset provision. Not even Judge Zonay, who dissented in *Burton* to argue that § 4007(c) was no longer law, disagreed on this point. See *Burton*, 2010 VT 55, ¶¶ 24-26 (Zonay, Spec. Ass. J., dissenting) (conceding legislative intent for § 4007(c) to remain in effect after June 30, 1996). The dissent's concession in *Burton* is not disputed here: the Legislature's failure to specify that repeal would take effect before July 1, and thus supersede that default date, was nothing other than a technical mistake. To imagine otherwise would leave the Legislature's intended repeal of the sunset provision an entirely empty gesture, a reading rejected by established canons of statutory construction. See *In re Margaret Susan P.*, 169 Vt. 252, 263, 733 A.2d 38, 47 (1999) (rejecting statutory construction that would render part of statutory language redundant). Applying the statutory default date to invalidate § 4007(c) would thwart the Legislature's "manifest intent" that the opportunity to recover attorney's fees continue in place after June 30, 1996. Since § 101 forbids an application of the § 212 default date to frustrate plain legislative intent, and since the Court is to effectuate that intent, the Legislature's repeal of the sunset provision must be read as taking effect before any unintended nullification by default.[3] See *Mass. Mun. Wholesale Elec. Co. v. State*, 161 Vt. 346, 359, 639 A.2d 995, 1004 (1994) (relying on § 101

---

[3] The dissent in *Burton*, much like the Kirschbaums do here, reasoned that the Legislature's failure to state an effective date of its repeal of the sunset provision meant that the repeal could not take effect until July 1, 1996. The dissent accepted that the Legislature intended that § 4007(c) continue in effect after June 30, but emphasized what it saw as separation of powers concerns, stating that "the Court is obligated to enforce statutes as they are in effect or — in the instant case — not in effect" and for the Court to hold that § 4007(c) "somehow saw the light of dawn after [it] expired on June 30, 1996 would effectively serve as the Court enacting a statute — a role reserved exclusively for the Legislature." 2010 VT 55, ¶ 25. This reasoning has a certain persuasive simplicity, but the real separation of powers concern would arise, in our estimation, from this Court's refusal to

in holding that statutory rule against retroactive application of legislation, 1 V.S.A. § 213, did not apply because it would contradict manifest intent of Legislature); *In re Lionni*, 160 Vt. 625, 626, 648 A.2d 832, 833 (1993) (mem.) (citing § 101 in favor of proposition that a statute's authority for a binding majority vote of planning commission members "must be followed unless it is inconsistent with the manifest intent of the general assembly or repugnant to the context of the same statute" (quotation omitted)); *State v. Vt. Emergency Bd.*, 136 Vt. 506, 508-09, 394 A.2d 1360, 1361-62 (1978) (looking to § 101 in upholding a proffered statutory construction not inconsistent with manifest legislative intent or repugnant to statutory context). Accordingly, § 4007(c) continued in effect after June 30, 1996, and was properly applied in this case.

 ¶ 13. The Kirschbaums' reliance on § 214 does not change this result. Section 214(a) states that an "amendment or repeal of an act or of a provision of the Vermont Statutes Annotated shall not revive an act or statutory provision which *has been repealed.*" (Emphasis added.) In the first place, § 101 again dictates that § 214 not be read in a way that hinders the plain intent of the Legislature. Moreover, by its own terms, § 214 bars the Legislature, by amendment or repeal of a law, from resurrecting a prior law no longer in existence at the time of the attempted amendment or repeal. The precise evil which § 214 seeks to exorcise from the canons of statutory construction is the common law doctrine of "revival by repeal," under which a repealed statute is automatically revived by the later repeal of the repealing statute. See 1 W. Blackstone, Commentaries 90 (Clarendon Press ed. 1765) (allowing that "[i]f a statute, that repeals another, is itself repealed afterwards, the first statute is hereby revived, without any formal words for that purpose").[4] This circumstance is not

---

effectuate the undisputed and manifest intent of the Legislature on account of an error of form and not of substance. To borrow from John Quincy Adams, to invalidate § 4007(c) on this ground would be for this Court to go "abroad in search of monsters to destroy."

[4] Blackstone cites as an example that Parliament, during the reign of Queen Mary, repealed statutes enacted under the reign of King Henry VIII declaring the King of England to be the supreme head of the church. But when these repealing statutes were themselves repealed under Queen Elizabeth, Blackstone explains, "these acts of king Henry were impliedly and virtually revived." Blackstone, *supra*, at 90. Though not subject to the same turns as Reformation-era English politics,

before us here, because the Legislature enacted its repeal of the sunset provision on April 6, 1996, *before* the sunset provision went into effect. As such, § 214 does not apply to this case.

¶ 14. Having decided that § 4007(c) remained in effect after June 30, 1996, we next consider the Kirschbaums' argument that the court erred in denying their motion for a directed verdict on First Quality's Prompt Pay Act claim, and therefore should not have been awarded attorney's fees under § 4007(c). The Kirschbaums make two linked arguments on this issue. They first argue that the court needed, but failed, to find that the Kirschbaums had no good faith basis to withhold payment as a precondition to awarding attorney's fees, rather than focus solely on who was the substantially prevailing party. The Kirschbaums similarly maintain that they were entitled to a directed verdict because they withheld payment for the carpeting in good faith.

¶ 15. At the close of First Quality's case, the Kirschbaums moved for a directed verdict and the court reserved ruling. Although never formally decided, this motion was effectively denied when the court ruled in favor of First Quality on the merits of its Prompt Pay Act claim. Because the merits decision resolved the motion for a directed verdict, we review that decision relating to the Kirschbaums' justification for withholding payment. Factual findings underlying the court's decision will be upheld absent clear error, while the court's legal conclusions are reviewed de novo. *Gladstone v. Stuart Cinemas, Inc.*, 2005 VT 44, ¶ 12, 178 Vt. 104, 878 A.2d 214.

▮ ¶ 16. The court's findings as to the Kirschbaums' bad faith are supported by the record. The court relied on two particular instances of less-than-straightforward dealing to conclude that the Kirschbaums had no good faith basis to withhold payment. The court found that First Quality's charges to the Kirschbaum American Express card were authorized, and that Mr. Kirschbaum's representation to the contrary was not credible. The finding is supported by the testimony of both Mr. Woltjen and Mr. Kirschbaum that, per their agreement, the customer's credit card

---

the majority of states have now passed statutes that abandon the common law doctrine of revival by repeal. See 1A N. Singer & J. Singer, Statutes and Statutory Construction § 23:32, at 548-51 (7th ed. 2009); see also, e.g., *Weinstein, Bronfin & Heller v. LeBlanc*, 182 So. 2d 835, 842 (La. Ct. App. 1966) (applying Louisiana statute providing that "[t]he repeal of a repealing law does not revive the first law"), *rev'd on other grounds*.

was to be charged at the point of sale and when the carpet arrived from the manufacturer. The court also found that, despite the Kirschbaums' claims to the contrary, First Quality stood prepared to uphold the parties' agreed-upon plan to replace the defective carpeting but, due to the Kirschbaums' actions, it never had the chance to do so. Again, both Mr. Woltjen and Mr. Kirschbaum testified to the latter effect and, as the court noted, it was First Quality who insisted on replacement as a condition for installing the defective carpet in the first place. These findings, in turn, support the court's conclusion that the Kirschbaums had no good faith basis to withhold payment.

■ ¶ 17. The Kirschbaums' second argument is that the court did not again explicitly recite its finding of bad faith when awarding attorney's fees. This is either a hyper-technical or phantom concern, however, since the court already stated its conclusion as to their lack of good faith when deciding the merits. Having already spoken on this issue once, § 4007(c) required no redundancy on the issue when addressing attorney's fees.

¶ 18. Finally, we consider the Kirschbaums' argument that the civil division improperly denied their claim under the Consumer Fraud Act (CFA). The Kirschbaums argue that the court misinterpreted the CFA to apply only to statements made at the point of sale when it reasoned that any alleged misrepresentations by First Quality did not violate the CFA because "the purchase of the carpet . . . had already occurred and thus the statements had no impact upon any decision to purchase" the carpet. They assert that the CFA covers both sales as well as services provided after the point of sale, and that First Quality violated the CFA by failing to "disclose the extent of the installation of the defective carpeting" and "by refusing to replace all of the defective carpeting or repair defective seams."

■ ¶ 19. To establish a claim under the CFA, a plaintiff must prove three elements: "(1) there must be a representation, practice, or omission likely to mislead the consumer; (2) the consumer must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be 'material,' that is, likely to affect the consumer's conduct or decision with regard to a product." *Greene v. Stevens Gas Serv.*, 2004 VT 67, ¶ 15, 177 Vt. 90, 858 A.2d 238 (quotations omitted). Material misrepresentations may be made either at the time of sale, or in the course of

services provided after the point of sale. See *Jordan v. Nissan N. Am., Inc.*, 2004 VT 27, ¶ 5, 176 Vt. 465, 853 A.2d 40 (stating that to prove third element of consumer fraud plaintiff must show that "the misleading representation was material in that it affected the consumer's purchasing decision"); see also 9 V.S.A. § 2451a(a) (defining "consumer" under CFA as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services . . . for his or her use or benefit or the use or benefit of a member of his or her household"). Regardless, the civil division did not reinterpret this third element of consumer fraud in denying the Kirschbaums' claim. Rather, its ruling rested on the factual determinations that First Quality made no misleading statements at any point regarding the defective carpeting and that, in any event, the Kirschbaums did not rely on any such statements in making decisions regarding their purchase.[5]

¶ 20. Contrary to the Kirschbaums' characterization, therefore, the court's determinations implicate no questions of law subject to de novo review. We will uphold the court's findings "unless they are clearly erroneous" and affirm its conclusions "as long as they are reasonably supported by the findings." *Waterbury Feed Co. v. O'Neil*, 2006 VT 126, ¶ 6, 181 Vt. 535, 915 A.2d 759 (mem.); V.R.C.P. 52(a)(2). We hold that the court's conclusion that First Quality made no misrepresentation is supported by its findings, which are supported by the evidence.

¶ 21. The court made precise findings concerning the parties' knowledge of the defective carpet, its location, and First Quality's willingness to replace it, none of which support the Kirschbaums' argument. It found that "[t]here [was] no evidence, despite [the Kirschbaums'] assertion, that Woltjen knew that some of the upstairs rooms were carpeted with the faulty carpet" and that

---

[5] We note that the Kirschbaums also argue that the court incorrectly found that the sale had already occurred at the time of First Quality's statements, reasoning that "the sale had never been completed" as the Kirschbaums still had not made the final payment. The Kirschbaums thus try to have it both ways, arguing not only that the CFA applies after the point of sale, but also that the sale was not yet completed at the time of First Quality's alleged violation. The Kirschbaums' main argument, however, concerns First Quality's purported nondisclosure regarding the defective carpeting. Because we resolve this issue on the basis of whether the evidence supported that First Quality made any misrepresentation, not whether it supported that any such misrepresentation was material, we need not address the court's apparent finding concerning the time of sale.

there was "confusion between the parties over where exactly the faulty carpet was installed." These findings are supported by Mr. Woltjen's testimony that he was unaware that any defective carpeting had been installed in the upstairs of the Kirschbaums' home. The court further found that First Quality was willing to replace the defective carpet as the parties had agreed but that the Kirschbaums "never allowed First Quality to come back to do the replacement." These findings are also supported by the testimony of Mr. Woltjen, which the court found credible in light of his initial refusal to install the defective carpeting.

¶ 22. The trial court's findings are thus supported by the evidence in this case, and they support its conclusion that First Quality did not fail to disclose the extent of the defective carpeting in the Kirschbaum home or refuse to install the replacement carpet. See V.R.C.P. 52(a)(2) (providing that Court should defer to trial court's weighing of credibility on appeal). We therefore have no reason to disturb the court's determination that First Quality made no misleading statements to the Kirschbaums regarding the carpeting. Because the evidence supports the finding that First Quality made no misrepresentation to the Kirschbaums, and this fact was by itself sufficient to defeat the Kirschbaums' consumer fraud claim, we need not consider the Kirschbaums' claim of reliance.

¶ 23. The Kirschbaums also argue that the court erred in not ruling that First Quality violated the CFA by breaching warranties associated with the carpeting. We decline to consider this argument because it was not made below. The Kirschbaums asserted separate counterclaims before the civil division for a consumer fraud violation and for breach of express and implied warranties. According to their answer and counterclaim, the Kirschbaums' consumer fraud claim was based solely on "reliance upon false or fraudulent representations or practices," rather than any allegations of warranty breach by First Quality. On appeal, however, the Kirschbaums assert their warranty-based arguments as another consumer fraud violation. This metamorphosis turns this argument into a new, and thus unpreserved, claim on appeal. See *Jordan*, 2004 VT 27, ¶ 10 (explaining that plaintiffs' claim was not preserved for appeal where they raised it on different ground before trial court). In summary, the civil division's grant of

attorney's fees under § 4007(c) is affirmed. The court's denial of the Kirschbaums' consumer fraud claim is likewise affirmed.

*Affirmed.*