2014 VT 23

# Old Railroad Bed, LLC v. Ronald A. Marcus, Kristi Marcus, et al.

[95 A.3d 400]

No. 12-341

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed March 7, 2014

*Robert E. Woolmington* of *Witten, Woolmington & Campbell, P.C.*, Manchester Center, for Plaintiff-Appellee.

*Allan R. Keyes* and *James B. Anderson* of *Ryan, Smith & Carbine, Ltd.*, Rutland, for Defendants-Appellants.

¶ 1. **Reiber, C.J.** This is a dispute over title to an old railroad bed adjacent to defendants' property that plaintiff purchased with the goal of creating a public recreational trail. Defendants challenge the trial court's determination that plaintiff acquired a valid fee simple interest in the property, asserting that title either reverted to them when the railroad abandoned the line or vested in them through adverse possession. We affirm.

¶ 2. The background to this dispute may be succinctly summarized; additional material facts will be set forth in the discussion which follows. The property in question, located in the Town of Manchester, consists of a strip of land approximately fifty to eighty-two feet wide, comprised of several adjoining parcels conveyed by three separate warranty deeds in December 1902 from defendants' predecessors-in-interest to the Manchester, Dorset & Granville Railroad Company (MD&G). MD&G was incorporated in June 1902, tracks were laid in 1903, and the railroad began operating in 1904, chiefly for the transportation of marble. In 1913, the Vermont Marble Company acquired MD&G's stock. Railroad operations were suspended in 1918, revived briefly in 1924, and ceased altogether in 1934, when the tracks were removed from the railroad bed. Two years later, MD&G conveyed

all of its remaining assets to Vermont Marble, and filed articles of dissolution. In 1992, Vermont Marble merged with OMYA, Inc., which became title holder of the railroad bed property. In 2009, plaintiff Old Railroad Bed, LLC purchased the property from OMYA for $39,614, for the purpose of creating a public recreational trail.

¶ 3. As noted, defendants own property adjacent to the old railroad bed and are the successors-in-interest of the original grantors of the property to MD&G. Defendants Ronald and Kristi Marcus own the northernmost property, defendants Bradford West, Vernon West, and Cathy Cushing own property to the south of the Marcuses, and defendants Donald and Eleanor Dykes own property to the south of the West/Cushing parcel. When the Marcuses objected to plaintiff's right to pursue its trail plan, plaintiff filed an ejectment action against them, seeking a writ of possession and injunction to prevent them from interfering with plaintiff's rights. The other adjacent property owners were subsequently granted leave to intervene in the lawsuit as co-defendants (hereafter collectively "defendants").

¶ 4. Defendants ultimately filed two motions for summary judgment, one based on a claim that MD&G had acquired only an easement in the property, which reverted to the original grantors and their heirs and assigns, i.e., defendants, when the line was abandoned, and the other on a theory of adverse possession. In November 2011, the trial court issued a written decision, resolving the first claim in favor of plaintiff. The court concluded that each of the three original deeds on its face "convey[ed] a fee simple interest to MD&G"; that a location survey by the railroad company referenced in each of the deeds and later recorded did not effectively convert the conveyances into takings by condemnation;[1] and that the statutory scheme in effect at the time did not preclude the railroad from obtaining a fee simple interest through a mutually agreed transfer of title for consideration.

¶ 5. In an order issued the following month, the trial court denied defendants' motion for summary judgment on the adverse possession claim, finding that genuine issues of material fact remained in dispute. In July 2012, following a two-day court trial,

---

[1] Although the trial court mistakenly stated that "nothing in the record shows that the survey . . . was conducted prior to the agreement of the parties," as discussed below the error is immaterial.

the court issued a thirty-two page decision rejecting the claim on its merits, and thereafter entered a final judgment in favor of plaintiff. This appeal followed.

## I.

¶ 6. Defendants do not challenge the trial court's finding that each of the deeds conveyed a fee simple interest to MD&G. They contend, nevertheless, that MD&G acquired at most an easement in the properties which reverted to the grantors and their heirs and assigns when the line was abandoned. As below, defendants advance two arguments to support the claim. First, they cite settled law that a railroad acquiring property by condemnation receives only an easement interest that reverts to the grantor upon abandonment. *Dessureau v. Maurice Mem'ls, Inc.*, 132 Vt. 350, 351, 318 A.2d 652, 653 (1974). While acknowledging that MD&G did not acquire the properties through formal eminent domain proceedings, defendants maintain that because the land records reveal the location survey was recorded before the deed, they were obtained under "threat of condemnation" and therefore subject to the same common-law limitation requiring reversion upon abandonment.[2]

¶ 7. ▮▮ Defendants place principal reliance on *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996), a Federal Circuit court decision involving a takings claim arising from an attempted conversion of an abandoned railroad line to a recreational trail in Burlington, Vermont. The record there showed that, in 1899, the Rutland-Canadian Railroad obtained three parcels for a railroad line, two (parcels A & B) by eminent domain pursuant to a commissioner's award of damages, and a third parcel (parcel C) — owned by the plaintiffs' predecessor-in-interest — by warranty deed conveying a fee simple interest. *Id.* at 1531-34. Noting that the deed to parcel C "was given following survey and location" of the line by the railroad company pursuant to the statutory takings procedure and that "the A & B parcels unquestionably involved conveyances of easements [by condemnation] and not fee simple

---

[2] Pursuant to statute, railroad corporations were authorized to undertake a survey to locate the most advantageous route for a proposed railroad, and were required to record the final location in the clerk's office of each town through which the railroad would pass. See 1894 V.S. §§ 3808, 3809. These provisions are currently codified in 5 V.S.A. §§ 3518, 3519.

estates," the court concluded that "[o]n balance it would seem that . . . the proceeding retained its eminent domain flavor" and the railroad thus acquired only an easement in all three parcels. *Id.* at 1536-37.[3]

¶ 8. To the extent that the federal court relied on the location survey, together with all of the other surrounding circumstances, as evidentiary support for finding that the third parcel was effectively taken by eminent domain, *Preseault* appears to be unexceptional. To the extent that, as defendants here argue, *Preseault* holds that a location survey automatically converts a subsequent fee-simple conveyance into an easement, we know of no law in Vermont or elsewhere to support such a claim. See *Gregory v. United States*, 101 Fed. Cl. 203, 210 (2011) (rejecting claim based on *Preseault* that fee-simple deed to railroad could convey only easement following survey and location, observing that there was "no [such] rule in Mississippi"); *Miller v. United States*, 67 Fed. Cl. 542, 545 (2005) (rejecting *Preseault*-based argument that fee-simple deed to railroad following survey took "on the character of a condemnation proceeding," noting the absence of any "Missouri law that would incline us to reach a similar conclusion, permitting us to ignore the deed").

¶ 9. The principal Vermont decision on which *Preseault* relied, *Troy & Boston R.R. v. Potter*, 42 Vt. 265 (1869), was a trespass action by a railroad for damages caused when the defendant, an adjacent landowner and the party from whom the railroad had acquired the line by eminent domain, entered the right-of-way to remove grass. The defendant claimed that the railroad had never acquired a valid interest in the land because it failed to record its location survey in the town clerk's office, as required by the company's legislative charter. *Id.* at 271. This Court rejected the claim, concluding that the survey and location of the road were sufficient to effectuate the taking without the recording, and therefore that defendant could not "take advantage of the omis-

---

[3] The *Preseault* court explained that, to resolve the question, it was compelled to "determine this question of state law ourselves," 100 F.3d at 1534, but it is, of course, beyond dispute that this Court is the final word on the meaning of Vermont statutory and common law. See *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("This Court . . . repeatedly has held that state courts are the ultimate expositors of state law."); *Deeper Life Christian Fellowship, Inc. v. Sobol*, 948 F.2d 79, 84 (2d Cir. 1991) ("It is well-established that the highest court of a state has the final word on the meaning of state law.").

sion by the Company in these respects." *Id.* at 272. The issue presented here — the effect of a survey and location on a subsequent fee-simple interest deed to a railroad — was not raised in *Troy*, and the Court did not address it.

¶ 10. The other Vermont decision cited by the federal court, *Hill v. Western Vt. R.R.*, 32 Vt. 68 (1859), raised the question of whether a creditor could place a lien upon certain property acquired by the defendant railroad by contract, and the Court interpreted the contract to convey only an easement not subject to levy. Although in its lengthy discussion of railroad law the Court observed that, whether a railroad takes by purchase or condemnation, "the proceeding is, in some sense, compulsory," it did not purport to hold that a grantor may not convey, nor a railroad acquire, a fee interest. *Id.* at 75. Indeed, the Court expressly limited its holding, stating that it did "not intend to say that if [the railroad] purchased and took the conveyance of the fee of land for [railroad] purposes, they could not hold it or convey it." *Id.* at 74. Thus, neither of the Vermont decisions cited in *Preseault* stands for the ultimate proposition that a location survey precludes a subsequent fee-simple conveyance to a railroad.

¶ 11. The circuit court in *Preseault* also indicated that it had relied on the analysis of the lower federal claims court, which relied in turn on two additional turn-of-the-century decisions. See *Preseault v. United States*, 24 Cl. Ct. 818, 830 (Fed. Cl. 1992). The first, *Williams v. Odessa & M. Ry.*, 44 A. 821, 836 (Del. Ch. 1895), simply observed, in the course of determining a railroad's authority to relocate a line after the initial location survey, that a "location is not a mere right; it is an act." The court did not address any question concerning the effect of a railroad survey on a subsequent fee-simple deed. The second, *Chesapeake & O. Ry. v. Deepwater Ry.*, 50 S.E. 890 (W. Va. 1905), involved a dispute between rival railroad companies over priority to a certain property for their respective lines. The West Virginia court ruled that, as between the competing claimants, the plaintiff had established priority by surveying and locating the line pursuant to the authority in its legislative charter, which was sufficient to show its exercise of dominion over the property. See *id.* at 896 ("The choice of a location by laying it out by survey, and the passage of the resolution by the board of directors adopting it as the location on which the road will be built, is itself the exercise of delegated legislative power conferred upon the company. It is an exercise of

the power of eminent domain to that extent."). Again, the case involved only the effect of a location survey on the railroad's claim to a vested right in the property, not its effect on a subsequent purchase under a fee-simple deed.

¶ 12. ■ The limited nature and scope of the *Chesapeake* holding becomes clear by examining the two principal decisions on which it relied, one from New York and the other, interestingly, from Vermont. See *id.* at 897. The New York decision, *Rochester H. & L. R.R. v. N.Y., L. E. & W. R.R.*, 17 N.E. 680 (N.Y. 1888), also involved a dispute between railroad companies over priority to the same parcel for their respective lines, and the court held that, when a railroad had exercised its delegated authority to "file[ ] a map and survey of the line of route it intends to adopt for the construction of its road, . . . it has impressed upon the lands a lien in favor of its right to construct, which ripens into title through purchase or condemnation proceedings." *Id.* at 682. The Vermont decision, *Barre R.R. v. Montpelier & Wells River R.R.*, 61 Vt. 1, 17 A. 923 (1889), involved a similar dispute between railroad companies, and this Court accorded similar priority to the company which had first conducted a location survey, approving the principle that "when the initial steps, pointed out by the statute, were taken, there only remained for the company to acquire through purchase, or through proceedings *in invitum*,"[4] the property through which the line of route had been surveyed. *Id.* at 6, 17 A. at 924. Neither case purported to hold that a location survey, as a matter of law, effectively precludes a railroad from subsequently purchasing, or the landowner from subsequently conveying, a deeded fee-simple interest. On the contrary, as noted, both cases confirmed that, while a location survey might be sufficient to vest in the railroad an exclusive right or priority to construct its line, that right would not ripen into title until a subsequent *"purchase* or condemnation proceedings." *Rochester R.R.*, 17 N.E. at 682 (emphasis added); *Barre R.R.*, 61 Vt. at 6, 17 A. at 924.

¶ 13. ■ In light of the foregoing cases and authorities, we find no support for defendants' assertion that, merely by virtue of the

---

[4] "In invitum" connotes an action "[a]gainst an unwilling person," Black's Law Dictionary 799 (8th ed. 2004), and is often used in connection with proceedings in eminent domain. See, e.g., *City of Winooski v. State Hwy. Bd.*, 124 Vt. 496, 500, 207 A.2d 255, 259 (1965).

location survey referenced in the original deeds, the properties here were necessarily acquired by eminent domain. Nor do we find any other record evidence demonstrating that the deeds were made under such a climate of compulsion that they acquired the character of a condemnation proceeding, thereby conveying only easements rather than fee simple interests. The trial court found that the claim was "entirely speculative," and the record fully supports this conclusion. Accordingly, we find no basis to disturb the ruling. See *First Quality Carpets, Inc. v. Kirschbaum,* 2012 VT 41, ¶ 20, 192 Vt. 28, 54 A.3d 465 ("We will uphold the court's findings unless they are clearly erroneous and affirm its conclusions as long as they are reasonably supported by the findings." (quotations omitted)).

¶ 14. Defendants' second argument is that MD&G was disabled *by statute* from acquiring and holding any property interest greater than a revertible easement. Defendants find support for this argument in a provision of the statutory scheme governing railroad corporations at the time of the conveyances, which provided as follows: "This section [dealing with the procedural requirements for taking property by eminent domain] shall not prevent a company from taking and holding voluntary grants of real estate made to it, to aid in the construction, maintenance and accommodation of its railroad; *but such real estate shall be held and used for the purposes of such grant only.*" 1894 V.S. § 3761 (emphasis added). Assuming that the purpose of the conveyances here was the construction and operation of a railroad, defendants maintain that — by virtue of the underscored language — MD&G could retain the land in question only so long as it was held and used for those purposes, and it reverted to the grantors or their heirs and assigns when the line was abandoned.

¶ 15. The trial court summarily rejected the argument, stating that it was "unable to find any support for this interpretation in the language of the legislation." Plaintiff, for its part, had argued that defendants' interpretation was inconsistent with a provision in the same law that allowed railroad corporations not only to purchase but to "convey" real estate as the purposes of the corporation required. 1894 V.S. § 3753. The authority to sell implied the authority to take and hold an absolute fee simple interest. Another section of the law also authorized a railroad corporation to "purchase or otherwise take lands or materials necessary for making or securing its railroad." 1894 V.S. § 3810.

Plaintiff also noted that limiting language of a similar nature appeared in the railroad charter at issue in *Page v. Heineberg*, 40 Vt. 81 (1868) (which authorized the railroad company to "take the use and possession of land and real estate for the purposes therein expressed"), where this Court nevertheless held that the railroad had validly acquired a fee simple estate in the property at issue. *Id.* at 86.

¶ 16. ■ ■ Although we are not entirely persuaded that defendants' argument is quite as groundless as the trial court found, neither are we entirely certain that defendants' is the only reasonable interpretation of the statutory language at issue. Whatever the legislative intent in 1894 may have been, however, is a question we need not here resolve. For even assuming arguendo that defendants' construction is correct, and that the railroad's acquisition of an absolute fee interest exceeded its delegated statutory authority, defendants here have no standing to assert the claim.[5]

¶ 17. ■ ■ It is settled law that a conveyance of property "to or by a corporation may transfer the title even though the corporation has no power . . . to hold or transfer the property." 7A C. Jones, Fletcher Cyclopedia of the Law of Private Corporations § 3424, at 33 (2006). Such "ultra vires"[6] contracts are traditionally said not to be void, but voidable, and then only by the state, not by subsequent grantees or strangers to the sale. See *id.* § 3500, at 94-95 (where "ultra vires contract" to purchase real property is fully performed, "title vests in the corporation, at least as against all persons but the state, and the corporation may afterwards sell the property," and a claim of ultra vires may not "be asserted . . . by a third person who is a stranger to the transaction."). Thus, a corporation which receives title to real estate, "although its acquisition of title was ultra vires, could transmit title to another" and the "fee [would] not revert to the

---

[5] Although this issue was not expressly raised below or on appeal, "[s]tanding is a jurisdictional issue," *In re Verizon Wireless Barton Permit*, 2010 VT 62, ¶ 20, 188 Vt. 262, 6 A.3d 713, and as such may be examined by this Court "on our own motion, if necessary, when a defect appears." *In re J.T.*, 166 Vt. 173, 181, 693 A.2d 283, 288 (1997).

[6] "A corporation may exercise only those powers that are granted to it by law, by its charter or articles of incorporation . . . ; acts beyond the scope of the power granted are ultra vires." Jones, *supra*, § 3399, at 6-7.

grantor of the corporation upon the dissolution of the corporation, although the transfer was ultra vires." *Id.* § 3502, at 99; see also 5 S. Thompson, Commentaries on the Law of Private Corporations §§ 5795, 5797, at 4489-91 (1894) (observing that, "although a corporation may be disabled or forbidden from holding land . . . its title will be good except as against the State alone" and it "may in the mean time convey an indefeasible title to another, of whatever estate in the lands had been conveyed to or acquired by it"). The rule that a fully executed ultra vires transfer of real property may be challenged only by the state — not by subsequent assigns of the parties — applies regardless of whether the transfers are "prohibited by statutes or charter, such as statutory limitations upon the . . . real property that a corporation may hold." Jones, *supra*, § 3511, at 106.

¶ 18. ■ Case law to this effect is uniform and longstanding. In *Kerfoot v. Farmers' & Merchants' Bank*, for example, the U.S. Supreme Court summarized the rule as follows: "[A] conveyance of real estate to a corporation for a purpose not authorized by its [legislative] charter, is not void, but voidable, and the sovereign alone can object. Neither the grantor nor his heirs nor third persons can impugn it upon the ground that the grantee has exceeded its powers." 218 U.S. 281, 286 (1910); see also *Fritts v. Palmer*, 132 U.S. 282, 293 (1889) ("[T[he question whether a corporation, having capacity to purchase and hold real estate for certain defined purposes, or in certain quantities, has taken title to real estate for purposes not authorized by law, or in excess of the quantity permitted . . . , concerns only the State within whose limits the property is situated. It cannot be raised collaterally by private persons . . . ."); *Nat'l Bank v. Matthews*, 98 U.S. 621, 628 (1878) ("Where a corporation is incompetent by its [legislative] charter to take a title to real estate, a conveyance to it is not void, but only voidable, and the sovereign alone can object. It is valid until assailed in a direct proceeding instituted for that purpose."); *Louisville Sch. Bd. v. King*, 107 S.W. 247, 251 (Ky. Ct. App. 1908) ("The general rule is that although a corporation may be disabled or forbidden by the organic or statute law of a state from holding land except for particular purposes, or . . . beyond a prescribed limit or quantity, yet, if it does hold land in the face of such disabilities or prohibitions, its title will be good except as against the state alone, and that it will be deemed to have good title until its title is invalidated in a direct proceeding instituted by the state

for that purpose, and this rule prevents the title of the corporation from being assailed by its grantor or grantee."); *State v. Chicago, Burlington & Quincy R.R.*, 539 S.W.2d 760, 764 (Mo. Ct. App. 1976) (holding that, even if conveyance of fee of railroad was ultra vires under state constitution, "appellant has no standing to raise the question" as "only the attorney general of the state . . . may raise the question of ultra vires acts of a corporation"); *Mallett v. Simpson*, 94 N.C. 37, 1886 WL 853, at *3 (1886) (noting that "even when the right to acquire real property is limited by charter, and the corporation transcends its power in that respect, . . . a conveyance to it is not void, but only the Sovereign . . . can object").[7]

¶ 19. The rationale behind the rule — preserving stability and settled expectations in real property transactions and title ownership — has been cogently summarized as follows: "The great public inconvenience which would result from any other rule has led the courts to deny collateral attack upon the powers of a corporation, when the only question presented is as to the power of the corporation to be a conduit of title. The authorities on this point are uniform." E. Warren, *Executed Ultra Vires Transactions*, 23 Harv. L. Rev. 495, 505 (1910); see also *Natoma Water & Mining Co. v. Clarkin*, 14 Cal. 544, 552 (1860) ("It would lead to infinite inconveniences and embarrassments, if, in suits by corporations to recover the possession of their property, inquiries were permitted as to the necessity of such property for the purposes of their incorporation, and the title made to rest upon the existence of that necessity."); *Fayette Land Co. v. Louisville & N. R. Co.*, 24 S.E. 1016, 1020 (Va. 1896) (observing that the doctrine that the state alone can challenge an ultra vires corporate acquisition of property "rest[s] upon the principle . . . that it would be extremely inconvenient if every contractor with corporations might, for the purpose of avoiding their contracts, be permitted to institute inquiry as to violations of the charter").

---

[7] The Vermont Business Corporations Act, based on the Model Act, codifies a similar rule limiting standing to challenge ultra vires corporate acts to shareholders and the State acting through the Attorney General. See 11A V.S.A. § 3.04(b); *Mass. Mun. Wholesale Elec. Co. v. State*, 161 Vt. 346, 362-63, 639 A.2d 995, 1006 (1994); see also *Brattleboro Retreat v. Town of Brattleboro*, 106 Vt. 228, 238, 173 A. 209, 213 (1934) (noting that, with respect to enforcement of corporate charter limiting corporation's right to acquire and hold property, "the State alone could interfere").

¶ 20. ■ The rule barring collateral attacks on ultra vires corporate acquisitions of real property has been applied in many circumstances similar to those presented here, where a conveyance of land to a railroad company is later challenged by a successor-in-interest of the original parties as exceeding the company's authority to acquire and hold real property under its legislative charter or the governing statutory scheme. Consistent with the general rule stated above, courts have uniformly held that, even if the acquisition was ultra vires, the railroad could acquire and convey good title, which was voidable only through a direct enforcement action brought by the state. In an early case entitled *Land v. Coffman*, 50 Mo. 243, 1872 WL 7914 (1872), for example, the plaintiff holding a "sheriff's deed" to property which the grantor had conveyed years earlier to a railroad company and was subsequently sold by the railroad to the defendants, claimed that the original conveyance exceeded the railroad's authority under a statute — nearly identical to the one at issue here — which provided that "real estate received by voluntary grant shall be held and used for the purpose of such grant only." *Id.* at *7. The court rejected the claim, concluding that "no one, except the State" could challenge the conveyance through a "direct proceeding . . . against the [railroad], and not in a collateral proceeding like this." *Id.*

¶ 21. Another case even more closely on point is *Corning v. Lehigh Valley R.R.*, 217 N.Y.S.2d 874 (App. Div. 1961). There, as here, subsequent assigns of the original grantor of land deeded to a railroad in 1867 claimed that, even if the deed purported to convey a fee simple, the railroad acquired only an easement under a statute providing, in language nearly identical to the provision at issue here, that "real estate received by voluntary grant shall be held and used for the purposes of such grant only." *Id.* at 878. The court rejected the claim, explaining as follows:

> Even if the statute were construed as permitting a railroad company to take only a limited interest by voluntary grant and, in violation of the statute, the railroad company took a deed in fee simple, the most that could be said would be that it was an *ultra vires* act which might be attacked by the public authorities, but the deed would nevertheless be effective to vest title in the railroad. The conveyance is not void, but only voidable, and the sover-

eign alone can object. It is valid until assailed in a direct proceeding for that purpose.

*Id.* at 879 (quotation omitted).

¶ 22. Another early decision with features similar to the case at bar is *Carr v Miller*, 181 N.W. 557 (Neb. 1921). There the grantor conveyed a strip of land in 1899 to a railroad company, which sold the property years later to one Elliott, who in turn sold it to the defendant. Shortly after the original deed of sale, the same grantor mortgaged the same property to a trust company, which subsequently foreclosed, resulting in a sale to one Abbott, and eventually through a number of additional conveyances to the plaintiffs, who sued to eject the defendant from the property. Plaintiffs claimed that the railroad was not competent under state law "to acquire any higher title to real estate than an easement or right of way," an interest which reverted upon nonuse or abandonment, leaving the defendant — the railroad's successor-in-interest — with no interest. *Id.* at 559. The court rejected the argument, observing that under settled law "the plaintiffs could not raise the question of the competency of the [railroad] company to take a fee title to the land." *Id.* at 560; see also *Fayette*, 24 S.E. at 1019 (holding that purchaser of land from railroad who defaulted on purchase price could not claim, as a defense, that railroad was incapable of acquiring title or acquired at most a defeasible title, citing settled rule that "[n]o party except the state can object that a corporation is holding real estate in excess of its rights.") (quotation omitted); *Russell v. Texas & P. Ry.*, 5 S.W. 686, 690 (Tex. 1887) (concluding that it was "unnecessary to consider" whether state law conferred on the railroad defendant "the power to hold lands other than such as are reasonably necessary to the maintenance and operation of the road" because "the right to question its holding of lands other than such as are so necessary rests with the state alone").

¶ 23. It is clear from the foregoing principles and authorities that, irrespective of whether MD&G exceeded its statutory authority in acquiring the fee interests in question, defendants here have no standing to challenge the grants on this basis more than a century after their making. Accordingly, we find no basis to disturb the trial court judgment that plaintiff acquired a valid fee interest in the railroad bed.

## II.

¶ 24. ▮▮ Defendants also contend that the trial court erred in rejecting their adverse-possession claim to the disputed property. The applicable standard of review is well settled. Adverse possession is a mixed question of law and fact. *MacDonough-Webster Lodge No. 26 v. Wells*, 2003 VT 70, ¶ 17, 175 Vt. 382, 834 A.2d 25. We view the factual findings of the trial court in the light most favorable to the prevailing party below, and will not set aside the findings unless they are clearly erroneous. *Id.* Our review of the trial court's conclusions of law, however, is nondeferential and plenary. *Id.* To achieve title through adverse possession, the claimant must demonstrate that possession of the land was open, notorious, hostile, and continuous throughout the statutory fifteen-year period. *Id.* ¶ 24. The use or possession must be so substantial as to put an ordinary owner on notice of the adverse possessor's claim to absolute dominion over the property. See *Moran v. Byrne*, 149 Vt. 353, 355, 543 A.2d 262, 263 (1988) (observing that the adverse possessor " 'must unfurl his flag on the land, and keep it flying so that the owner may see, if he will, that an enemy has invaded his dominions and planted his standard of conquest' " (quoting *Barrell v. Renehan*, 114 Vt. 23, 29, 39 A.2d 330, 333 (1944))); *Scott v. Leonard*, 119 Vt. 86, 102, 119 A.2d 691, 700 (1956) (noting that, to establish adverse possession, claimant's "occupancy and use [must be] . . . of such a character as would indicate to the [owner] that she was exercising it as a matter of right" (quotation omitted)).

¶ 25. In its comprehensive ruling, the trial court here exhaustively reviewed the evidence adduced by the parties at trial and entered extensive findings and conclusions based thereon. In summary, with respect to each of the three principal adjoining landowners, the court found as follows. The Dykes' predecessors-in-interest, the Beatties, pastured horses on their property from 1971 to about 1991 and built a number of wire fences across both their property and the railroad bed to contain the horses, which traveled back and forth across the abandoned line. Although generally no longer intact, remnants of the old wire fences were found and noted by a surveyor in 1992, and are visible in more recent photographs. A licensed surveyor who walked the property and prepared a report for plaintiff testified that wire fences of this kind were typically considered fences of "convenience" to keep livestock in rather than to demarcate boundaries, and the

court so found. See *First Congregational Church of Enosburg v. Manley*, 2008 VT 9, ¶ 19, 183 Vt. 574, 946 A.2d 830 (mem.) (noting that while a fence intended to mark a boundary may provide evidentiary support for a claim of possession to the exclusion of others, a fence of "convenience" to contain animals does not necessarily demonstrate such a claim).[8] The trial court noted, as well, that a 1992 survey recognized the railroad property as separately held and owned; that the Dykes subsequently attempted through their surveyor to purchase a portion of the railroad property that ran through their land, and ultimately obtained a right-of-way from OMYA, plaintiff's predecessor-in-interest, for the construction of a driveway; and that they later submitted a municipal zoning application for a garage with a specific setback from the railroad property, again recognizing its separate ownership. The court concluded, on the whole, that while the evidence demonstrated the Beatties and Dykes had "made use of [the railroad property] from time to time," it was insufficient to demonstrate a claim to permanent and adverse possession.

¶ 26. The court reached a similar conclusion concerning the claim of the Marcuses, who obtained title in the late 1980's. The court found that they had allowed horses to roam across the railroad bed, had on occasion cleared trees from the bed to allow their passage, and had attempted to purchase the railroad property from OMYA in the early 2000's. The court concluded that these acts, viewed as a whole, were insufficient to provide notice of a claim of right to permanent and adverse possession of the disputed property. Although a metal gate and no-trespassing sign erected by the Marcuses did represent overtly hostile acts, the court found that they had not appeared before the commencement of this litigation.

¶ 27. The court concluded that the adverse-possession claim of the Wests was closer, but still insufficient.[9] The court found that Bradford West testified credibly that, since the late 1930's, he and his family had regularly cultivated hay and cornfields on their property and on land leased from the Marcuses' predecessors-in-interest on both sides of the raised railroad bed (although not on

---

[8] Bradford West acknowledged that wire fences of a similar kind and vintage on his property were erected and maintained to contain livestock.

[9] Because some of the Wests' agricultural activities occurred on lands leased from the Marcuses' predecessors-in-interest, the court included the Marcus property within its discussion of the Wests' claim.

the raised bed itself), pastured animals (mostly cows) on or near the railroad bed and allowed them to cross it, occasionally mowed and cleared brush from portions of the bed, and maintained a barbed wire fence across their property and the railroad bed until the late 1950's to mark a boundary with their southern neighbors and to keep their livestock confined. Although the court acknowledged that some evidence suggested that portions of the Wests' former corn and hayfields had encroached on the railroad property "to some extent," it found that the evidence was insufficient to determine with any certainty the nature or location of the encroachment. Even when the Wests were most heavily engaged in agricultural pursuits, the court found that the railroad bed was used principally as a means to gain access to their fields "and was not itself a cultivated area." The court concluded that, on the whole, the evidence adduced by the Wests of their actual use and possession of the property over time was "not strong enough to effectively put the world, and in particular the title owner, on notice of an adverse claim."[10]

¶ 28. ▮▮▮ For the most part, defendants do not challenge the court's findings so much as the conclusions it drew from them. They maintain, in short, that the evidence and findings *"compel* the conclusion that defendants fenced and farmed the [p]roperty openly in plain view for more than fifteen years . . . in a manner that would put a person of ordinary prudence on notice of the claim." (Emphasis added.) The argument is unpersuasive. As noted, although defendants and their predecessors ran wire fences across the railroad bed, the trial court reasonably concluded on the basis of the record evidence that they were not erected to stake a separate claim to the railroad bed but simply to contain livestock.

¶ 29. ▮▮▮ Furthermore, while defendants are correct that this and other courts have recognized that agricultural activities such as grazing cattle, pasturing horses, or cutting hay and brush may support a finding of adverse possession, they do not alone compel it. Thus, we upheld such a finding in *Jarvis v. Gillespie*, 155 Vt. 633, 587 A.2d 981 (1991), where the claimant had not only used

---

[10] The court identified one exception to this finding, consisting of a fractional .221 acre identified by plaintiff's surveyor as part of a "deed overlap" with the Wests. Plaintiff acknowledged, and the court found, that the Wests had continuously farmed this small parcel for fifteen years, entitling them to adverse possession.

the disputed land for "grazing cattle and horses" but had also run a logging operation, tapped maple trees, and fenced one of the disputed boundaries — factors not present here. *Id.* at 636, 587 A.2d at 983-84. Other courts, moreover, have found agricultural activities similar to defendants' to be insufficient to stake a clear claim to adverse possession as of right. See, e.g., *Lindsey v. Aldridge*, 104 So. 3d 208, 217 (Ala. Civ. App. 2012) (upholding trial court's finding that use of land for cow pasture did not show that plaintiff asserting adverse possession "intend[ed] to claim ownership of it when he used it"); *Weeks v. Krysa*, 2008 ME 120, ¶ 18, 955 A.2d 234 (observing that encroachments "including pasturing cattle on property and creating a brush fence to secure them, are not acts of sufficient notoriety to support an adverse possession claim"); *Harris v. Lynch*, 940 S.W.2d 42, 46 (Mo. Ct. App. 1997) ("[I]t has generally been held that maintenance of a non-boundary fence and allowing cattle to have access to undeveloped land, while evidence of possession, are not sufficient in themselves to establish adverse possession."); *McDonnold v. Weinacht*, 465 S.W.2d 136, 142 (Tex. 1971) (holding that grazing of livestock, clearing of weeds, and construction of fences were insufficient to support adverse-possession claim absent "evidence that the land was designedly enclosed . . . to show the assertion of claim hostile to the true owner"). We thus find no basis to disturb the trial court's ruling.

¶ 30. ▮▮ ▮▮ Defendants also claim that, even if they failed to establish adverse possession of the entire railroad bed, they achieved ownership through constructive possession, "the doctrine under which a claimant achieves possession of an entire plot through actual occupation of a part." *N.A.S. Holdings, Inc. v. Pafundi*, 169 Vt. 437, 441, 736 A.2d 780, 785 (1999). We have "recognized two methods of achieving constructive possession: (1) when the claimant is operating under color of title and (2) when the land is marked by clear and definite boundaries." *Id.* Although defendants assert constructive possession based on both methods, their argument falters on the trial court's finding, which they have not shown to be clearly erroneous, that defendants' evidence generally was "non-specific as to the particular portions" of the property they "actually occupied and possessed." Accordingly, the constructive-possession claim is unavailing, and provides no basis to disturb the judgment.

*Affirmed.*