2014 VT 126

## Jeffrey D. Hayes and Deborah Hayes-McGraw v. Town of Manchester Water & Sewer Boards and Mountain View Estates Homeowners Association

[112 A.3d 742]

No. 13-277

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**[1]

Opinion Filed November 21, 2014

---

[1] Justice Crawford was present for oral argument, but did not participate in this decision.

*Richard H. Coutant* of *Salmon & Nostrand*, Bellows Falls, for Plaintiffs-Appellees.

*Stephen L. Saltonstall*, Manchester Center, for Defendant-Appellant Town of Manchester.

*Lon T. McClintock, McClintock Law Office, P.C.,* Bennington, for Defendant-Appellant Mountain View Homeowners Association.

¶ 1. **Robinson, J.** This case involves the power of a court to require an estate to create a trust to satisfy feared future claims against the estate, as well as the proper application of the dead man's statutes, 12 V.S.A. §§ 1602-1603. Developers of a residential subdivision died, triggering various claims by and against their estates relating to the estates' responsibilities for the subdivision's private roadway, water, and sewer infrastructure. The Town of Manchester appeals a superior court decision denying the Town's request that the court create a trust from the assets of the estates to pay for repairs, maintenance, and improvements to the subdivision's sewer system to protect the Town's water supply. A group of homeowners separately appeals the trial court's denial of their request for a ruling that the estates have a legal obligation to dedicate the infrastructure to the Town and, until that happens, to maintain the infrastructure at their expense. We affirm the superior court's refusal to create the trust requested by the Town, but reverse the court's denial of the homeowners' request for a ruling on their claims, and remand for reconsideration of those claims based on the evidence, including evidence that the trial court previously excluded under the dead man's statute, to determine whether an enforceable promise was made concerning maintenance of the infrastructure pending its dedication to the Town.

¶ 2. The parties stipulated to the basic facts. In the late 1970s and early 1980s, Richard Hayes developed a subdivision called Mountain View Estates on land jointly owned by him and his wife, Nadine Hayes, in the Town of Manchester. The subdivision grew to include forty residential homes, a school building, and a chiropractic clinic on forty-four lots. It is by now essentially built out, and no further sales of lots for additional building are likely.

¶ 3. The subdivision plan was approved by the Town and the state, and the water and sewer systems were permitted. The subdivision plan did not include any specific plans or requirements for dedication of its two privately owned roads or water and sewer systems to the Town. Richard Hayes initially supplied water to the subdivision through his water company, which he sold to the Town in 1982 along with the water and sewer lines underlying nine of the lots in the subdivision. Since then, the Town has

supplied the water for the entire subdivision. The Hayeses continued to own the remaining portions of the subdivision's water and sewer systems, as well as the roadways, until they were simultaneously killed in a car accident in 2004. The sewer system includes underground lines and manholes that convey effluent by gravity to a pump station consisting of a holding tank and two submersible pumps. From the pump station, effluent is carried through an underground force main to the municipal sewer system, ending up at the Town's wastewater facility.

¶ 4. From the sale of the first lot in about 1981 until his death in 2004, Richard Hayes paid for maintenance and plowing of the roads that ran through the subdivision and maintained the subdivision's sewer system and the portion of the water system that he and his wife still owned, without charge to the homeowners.

¶ 5. In 2004, the Hayeses were killed in a car accident. A probate proceeding was opened in connection with their individual estates, and the Hayeses' adult children, Jeffrey D. Hayes and Deborah Hayes-McGraw, were appointed co-administrators. In August 2005, the Town filed a "claim," which the estates denied, asking that estate funds be set aside for updating and servicing the subdivision's water and sewer systems. The probate court allowed the claim and also granted the homeowners'[2] motion to intervene in the proceeding to protect their rights with respect to the access, operation, maintenance, inspection, repair, and improvement of the subdivision's sewer, water, and road infrastructure. During the probate proceeding, the Town and the homeowners raised related issues concerning the subdivision's infrastructure, but the legal issues raised by each on appeal are distinct. For simplicity, we discuss the pertinent facts, procedural background, and legal issues raised by each appellant separately.

## I. The Town's Appeal

¶ 6. The Town's primary concern in the proceedings below was that the subdivision's sewer system, which was owned and managed by the estates, was in disrepair and threatened the Town's

---

[2] In September 2005, a group of owners representing roughly two-thirds of the lots in the subdivision formed an unincorporated association and were granted party status in the probate proceedings. Throughout this opinion, we refer to the unincorporated association as the homeowners, even though not all of the homeowners in the subdivision belong to the association and have participated in these proceedings.

water supply. In September 2008, after a multiple-day hearing, the probate court ordered the estates to set aside $1 million to inspect the subdivision's water and sewer systems and to make any necessary updates and repairs, and to dedicate the updated systems to the Town.

¶ 7. The estates appealed the probate court's order to the civil division of the superior court, which considered the case in a de novo hearing. See 12 V.S.A. § 2555 (authorizing appeals of probate orders to civil division of superior court); *In re J.C.*, 169 Vt. 139, 143, 730 A.2d 588, 590 (1999) (stating that superior court "sits as a higher court of probate, considering the case anew as if no prior proceeding had occurred in the probate court").

¶ 8. In July 2009, the superior court denied the estates' motion for summary judgment, in which they argued that the Town's and the homeowners' claims against the estates were time-barred because the claims were not presented within four months of the first publication of the estates' notices to creditors. See 14 V.S.A. § 1203(a)(1) ("All claims against a decedent's estate which arose before the death of the decedent . . . are barred . . . unless presented . . . within four months after the date of the first publication of notice to creditors if notice is given in compliance with the rules of probate procedure . . . ."). The court ruled that (1) the estates' motion was procedurally nonconforming because it failed to contain specific citations to the record, as required by Vermont Rule of Civil Procedure 56; and (2) even if not procedurally deficient, the motion would be denied on its merits because neither the Town nor the homeowners had set forth "claims" as contemplated under § 1203.

¶ 9. The superior court held a hearing over five days between early August and late November 2012. With respect to its request that the court require the estates to set up a trust to finance repairs and maintenance to the subdivision sewer system, the Town presented testimony that: (1) the entire subdivision is within the Town's aquifer-protection area; (2) the pump station and some of the houses are located such that in the event of a leak, spill, or other failure, it would take a maximum of two years for pollution to migrate into and foul the Town's aquifer; (3) the Town's water wells and pump station are situated so that anything leaking from the subdivision sewage pump station naturally flows to the Town's wellhead; (4) users of the subdivision sewage system sometimes flush rags into the system, thereby clogging the

pumps; (5) during and following Hurricane Irene, the electric power needed to operate the pump station was out for two days; (6) the co-administrators were not performing regular preventive maintenance on the system, including flushing the sewer lines; (7) the sewage system had not been tested or certified; and (8) the system needed substantial modifications to protect the Town's aquifer — including replacement of some pipes, repair of a leak, installation of a standby electric generator or emergency storage tank, installation of an alarm dialer that provides telephonic warnings of failure, installation of a new pump and meters, and periodic pressure testing of the wet well.

¶ 10. On the basis of this evidence, the Town asked the court to require the estates either: (1) to set aside $934,800 in a trust to improve and maintain the sewage system, in addition to monies in trust in connection with the water system and roads,[3] or (2) to dedicate the entire infrastructure to the Town accompanied by a lump-sum payment of $600,000.[4]

¶ 11. The estates' expert offered contrary testimony, explaining that the Town's expert's video inspection was compromised by a failure to flush out the system beforehand, that the pumping station and sewage system generally were compliant with the standards in effect at the time they were installed, that the system was properly built and installed, that the pumping station was still in good working order at the time of trial, that there were a number of similar systems still functioning properly throughout the state, and that the very significant changes to the system proposed by the Town were unnecessary.

¶ 12. After examining the conflicting testimony of the parties' experts, the court found that the subdivision's current water and sewage systems did not present "a significant and imminent risk to the Town's water supply." In the court's view, the estimates of the Town's experts as to the repairs needed for those systems "went far beyond what would be reasonably necessary to keep the

---

[3] The Town does not appeal the superior court's ruling as it relates to its requested relief concerning the roads and water system, but appeals only with respect to the sewage system.

[4] Ultimately, the town selectboard, sewer board, and water board would have to accept any dedication of the roads, sewer system, and water system, respectively. In its pleadings, the Town represented that the town manager would strongly recommend that the respective boards accept the proposed dedication on the terms proposed by the Town.

thirty-year-old systems in good working order." The court declined to impose a constructive trust and concluded that injunctive relief was not necessary to protect the Town's water supply by addressing perceived shortfalls in the subdivision's sewer system because "the existing monitoring program is likely to be reasonably effective in detecting leakage" from the pump station.

¶ 13. On appeal, the Town takes issue with the superior court's findings and conclusions, emphasizing its evidence that the subdivision's sewer system presents a threat to the Town's aquifer. The Town argues on appeal that the court erred by failing to analyze the applicability of 14 V.S.A. § 1210(b)(2), a statute that authorizes the court to set up a trust to cover "future payment, or possible payment, on the happening of the contingency or on liquidation," despite multiple invocations of that statute by the Town. According to the Town, instead of evaluating the Town's claim under this statute, the court considered only the Town's common-law constructive trust argument and improperly subjected the Town's claims to the special burden of proof associated with claims for injunctive relief. Pointing to decisions in which this Court has emphasized a trial court's duty to decide the issues presented by the parties, the Town asks us to hold that § 1210(b)(2) applies in this case, and remand for a determination of how much money the estates should set aside in trust to repair, upgrade, and operate the sewage system.

¶ 14. The estates respond that the Town waived this argument. In connection with the estates' motion to dismiss the Town's claim as untimely, the superior court ruled that the Town's concern about the potential for a failure of the subdivision's sewer system, and the threat that would pose to the Town's drinking water source, was not a "claim" as defined in 14 V.S.A. § 1203 and was thus not time-barred. Rather, the court ruled, any claim by the Town had not yet arisen, as there had been no failure of the sewer system that would jeopardize the Town's water supply. The court reaffirmed this conclusion in its final order, and the Town did not challenge that conclusion — which benefitted the Town with respect to the question of whether its claim was timely. Given that both § 1203(a) and § 1210(b)(2) are part of the same chapter concerning settlement of claims in probate proceedings, the estates assert that it would be inconsistent for the Town to argue that it had not submitted a "claim" for purposes of § 1203(a), but that it had for purposes of § 1210(b)(2). The estates

further contend that, even if not waived, the argument fails on its merits because the court specifically refused to create a constructive trust under the common law, its ruling was supported by sufficient evidence, and 14 V.S.A. § 1210(b)(2) does not establish any particular standard for the creation of a trust or require anything beyond the discretionary findings made by the court in denying the Town's request for a trust.

¶ 15. We review the superior court's discretionary decision not to establish a trust deferentially. *Weed v. Weed*, 2008 VT 121, ¶ 16, 185 Vt. 83, 968 A.2d 310 ("We review equitable remedies, like the creation of a constructive trust, for a trial court's abuse of discretion."). We will uphold the trial court's factual findings unless they are clearly erroneous or unsupported by evidence in the record, but we review legal questions, such as whether § 1210(b)(2) potentially applies in this case, de novo. See *First Quality Carpets, Inc. v. Kirschbaum*, 2012 VT 41, ¶ 15, 192 Vt. 28, 54 A.3d 465 ("Factual findings underlying the court's decision will be upheld absent clear error, while the court's legal conclusions are reviewed de novo.").

¶ 16. ▇ We accept the superior court's factual findings as supported by substantial evidence, offered primarily through the estates' expert, and conclude as a matter of law that the Town has not established a claim, contingent or otherwise, of the sort for which § 1210(b)(2) offers potential security.[5] That statute, entitled "Claims not due and contingent or unliquidated claims" provides in relevant part:

> (a) If a claim which will become due at a future time or a contingent or unliquidated claim becomes due or certain before the distribution of the estate, and if the claim has been allowed or established by a proceeding, it is paid in the same manner as presently due and absolute claims of the same class.

> (b) In other cases the executor or administrator, or . . . the probate division of the superior court, may provide for payment as follows:

---

[5] We do not rely on the waiver argument urged by the co-administrators, although we acknowledge the tension between the Town's position that it is not subject to the provision governing timeliness of claims but can nonetheless invoke a provision allowing the court to provide security for contingent claims.

. . . .

> (2) arrangement for future payment, or possible payment, on the happening of the contingency or on liquidation may be made by creating a trust, giving a mortgage, obtaining a bond or security from a distributee, or otherwise.

14 V.S.A. § 1210. The plain purpose of the provision is to provide security to a claimant who has a contingent claim, or other claim that may or will mature in the future against an estate.

¶ 17. ■ ■ Although not defined in chapter 66 of Title 14, the word "claim" in statutes that establish deadlines for filing claims in probate proceedings generally "means those obligations which are in the broad sense of the term, debts and would include obligations arising out of contract express or implied." *Matey v. Estate of Dember*, 774 A.2d 113, 126-27 (Conn. 2001) (citation omitted). While our statutes expressly allow for the timely filing of contingent claims, 14 V.S.A. § 1203(a), and further allow the court to create a trust from estate assets based on such claims, *id.* § 1210(b)(2), those claims — though not yet matured — nevertheless must be "existing obligations . . . capable of proof." *Matey*, 774 A.2d at 127 (quotation omitted). Here, there was no contract between the Town and the Hayeses, either express or implied, regarding the sewer system, and thus no contractual obligation that could be triggered by some defined contingency. The Town's concern that the subdivision's sewer system could malfunction and potentially threaten the Town's aquifer at some time in the future is essentially a concern about the possibility of a future claim arising and does not constitute a contingent claim of the sort addressed by § 1210(b)(2). We need not decide whether evidence of a likely and imminent tortious invasion may in some case be so strong as to elevate a concern about a future harm to the level of a contingent claim. In this case, based on the superior court's well-supported findings, the Town has no present or contingent future claim against the estates; therefore, the court did not err in failing to expressly address § 1210(b)(2). Nor did the court abuse its discretion, given the record before it, in concluding that the Town was not entitled to equitable or injunctive relief in the form of a common law constructive trust. Accordingly, we affirm the superior court's judgment against the Town on this issue.

## II. The Homeowners' Appeal

¶ 18. In 2004, shortly after the Hayeses were killed in the car accident, the co-administrators of the Hayeses' estates sent a letter to the homeowners in the subdivision stating that, effective immediately, the homeowners would be responsible for maintaining and plowing the subdivision's roads. The homeowners refused to assume that responsibility, and the estates have continued to maintain the roads and water and sewer systems at their own expense throughout this litigation.

¶ 19. In the probate proceeding, the homeowners argued that when they bought their properties the Hayeses promised to maintain the roads at their own expense and eventually pave them and dedicate them to the Town. With respect to the water and sewer infrastructure, they argued that the Hayeses never disclosed to the homeowners that this infrastructure was privately owned, and instead led them to believe that they were directly connected to Town-owned facilities. They sought an order requiring the estates to fund the infrastructure maintenance pending dedication of the infrastructure to the Town. After a hearing, the probate court ordered the estates to set aside $1 million to inspect the subdivision's water and sewer systems and make any necessary updates and repairs, to dedicate the updated systems to the Town, and to pave the subdivision's roads and dedicate them to the Town. In so ruling, the probate court denied the estates' objection to admission of the testimony of several homeowners regarding oral agreements between them and the Hayeses concerning maintenance of the subdivision's roads, ruling that the testimony was admissible under an exception in the dead man's statutes "to meet or explain the testimony of living witnesses produced against" them. 12 V.S.A. § 1603.

¶ 20. On appeal de novo to the superior court, the homeowners requested that the court order the estates to dedicate the infrastructure to the Town, to pay the Town $600,000 should the Town accept the dedication, and to maintain the infrastructure at the sole expense of the estates. In support of their request, they sought to prove that the Hayeses made an enforceable promise to the homeowners to maintain the roads and then dedicate them to the Town. They pointed to one deed, from the Hayeses to the Norses, which provided that maintenance of the roadway would be maintained by the Hayeses until such time as the roadway was

turned over to the Town of Manchester.[6] The homeowners also sought to introduce testimony of various witnesses concerning the Hayeses' intentions with respect to maintaining and dedicating the roads, and concerning various promises made by Richard Hayes to individual homeowners in connection with the maintenance and dedication of the roads.

¶ 21. The estates sought to exclude "the testimony of any witness concerning conversations with or representations of the decedents on the issue of the decedents' responsibility for maintenance of any of the infrastructure at Mountain View Estates, the decedents' plans for the ultimate disposition of the infrastructure, or any related matters," based on the dead man's statutes. See 12 V.S.A. §§ 1602-1603. The first statute precludes a party from testifying in his or her own favor when the other party to the contract in issue is dead, except, in relevant part, "[t]o meet or explain the testimony of living witnesses produced against" that party. *Id.* § 1602(1). The second statute similarly restricts parties from testifying about contracts they had with persons no longer living when an executor or administrator is the other party to a proceeding. *Id.* § 1603.

¶ 22. The homeowners and the Town argued that the co-administrators had waived any right to object to such testimony by testifying themselves to their parents' intent regarding the maintenance and disposition of the infrastructure.

¶ 23. In a mid-trial decision, the superior court concluded that the dead man's statutes applied, but that the estates "partially waived" the protections under the statutes by not objecting during the probate division hearing to Jeffrey Hayes' testimony that his father intended to build out the infrastructure and dedicate it to the Town once it was finished. Concluding that testimony concerning Richard Hayes's statements to others regarding his plan for

---

[6] Wholly apart from any promises the Hayeses made to any other homeowners, this agreement, clearly reflected in the Norse deed, would seem to settle the question of the estates' duty to maintain the road or roads necessary to provide for ingress and egress to the property identified in that deed, and to take reasonable steps to dedicate that stretch of road or roads to the Town. The record is not clear on the question of whether the estates' obligations under the Norse deed necessarily cover the full extent of the private roads in question, and, on appeal, the homeowners are not basing their argument exclusively on the estates' obligations by virtue of the Norse deed. For that reason, we do not reach the question of whether the Norse deed alone compels the estates to maintain all the roads in question and dedicate them to the Town.

the development and its infrastructure was admissible "to meet or explain the testimony of living witnesses produced against them," the court ruled that testimony about statements of Richard Hayes regarding his plan for the development were admissible. However, the court declined to consider any testimony by any person concerning any particular promises or commitments made by Richard Hayes, as well as any testimony regarding Richard Hayes's statements concerning financial responsibility for maintaining the infrastructure up to the time when it would be dedicated to the Town.

¶ 24. As a result of this ruling, the superior court declined to allow or consider[7] the testimony of a number of homeowners who would have testified that they relied on Richard Hayes's promise to maintain the roads and ultimately dedicate them in agreeing to buy their properties.[8] The court apparently also struck testimony from the co-administrators themselves, both of whom testified that they knew their father had promised the homeowners that he would maintain the roads.[9] In particular, Deborah testified that her father had told her that he would maintain the roads until he turned them over to the Town, and that she knew her parents had promised to maintain the roadways for the homeowners until they were dedicated to the Town. Jeffrey likewise testified that he knew his father had told people that he would take care of the roads.

---

[7] The court issued its ruling on the applicability of the dead man's statutes in response to a standing objection, after some of the challenged testimony had come in. The court's ruling prohibited the introduction of the forbidden evidence prospectively, and struck from the record evidence that had been offered during the hearing prior to the court's ruling.

[8] With respect to the sewer and water infrastructure, the homeowners generally did not testify that Richard Hayes promised to maintain this infrastructure at his expense. Rather, the homeowners consistently testified that Richard Hayes never disclosed his continuing ownership of water and sewer infrastructure and thus they understood that the Town provided not only their water and sewer services, but also the underlying infrastructure. The estates did not introduce any evidence suggesting that the homeowners did know that the water and sewer infrastructure were privately owned.

[9] The superior court did not specifically identify the co-administrators' testimony in its ruling, but (1) its broad ruling prohibiting and striking testimony about promises or commitments made by Richard Hayes encompasses this testimony; (2) the trial court did not reference this testimony in its findings; and (3) the court apparently did not consider it in reaching its conclusions.

¶ 25. In its April 22, 2013 decision on the merits, the superior court first considered the enforceability of the alleged oral agreement to maintain and repair the roads, water, and sewer system. The court acknowledged that the Statute of Frauds generally bars claims regarding oral agreements concerning interests in real estate, but recognized that an equitable exception applies if the proponent of the agreement can show that (1) there was an oral agreement, (2) upon which they reasonably relied, (3) by changing their position so that they cannot be returned to their former position, and (4) the other party to the agreement knew of such reliance. *In re Estate of Gorton*, 167 Vt. 357, 361, 706 A.2d 947, 951 (1997). The court concluded that this exception did not apply because the homeowners failed to prove that they had an oral agreement with the developers for the maintenance and repair of the roads, water system, and sewer system until the Town accepted their dedication. Although the court found that the evidence presented at the trial established unequivocally that it was Richard Hayes's intention, throughout his lifetime, to dedicate the subdivision water and sewer system to the Town, and to offer the roads to be accepted as public roadways for which the Town would assume maintenance responsibility, the court concluded that the homeowners had not adduced "any credible evidence tending to show that there was ever a meeting of the minds" on these matters. Accordingly, the court ruled that the homeowners were not entitled to an order requiring the estates to pay for ongoing maintenance to any part of the infrastructure, could not compel the estates to offer the infrastructure for dedication to the Town, and were not entitled to any funding from the estates to pay for inspecting or updating the sewer system.

¶ 26. The homeowners argue that the superior court committed reversible error by: (1) improperly applying the dead man's statutes to exclude testimony concerning promises that the Hayeses made to certain homeowners; (2) concluding that they did not enter into a binding contract with the Hayeses; and (3) failing to consider their promissory estoppel argument.

¶ 27. The homeowners first contend that the superior court improperly applied the dead man's statutes to exclude testimony from both the co-administrators and certain homeowners that Richard and Nadine Hayes had promised the homeowners that they would maintain the private roads in the subdivision until those roads were dedicated to the Town. According to the

homeowners, the co-administrators' testimony was admissible because the co-administrators were not parties to the alleged contract, and the homeowners' testimony was admissible because it was presented in response to the co-administrators' testimony concerning promises Richard Hayes had made to homeowners. We agree on both counts.

A.

¶ 28. ■ In essence, the dead man's statutes restrict testimony concerning an alleged contract with a person who is no longer living. The statutes "must be construed in favor of the challenged witness" because they were enacted to allow testimony that was otherwise inadmissible at common law, rather than to create rules of disqualification, and because it "can be the cause of tremendous injustice by preventing proof of reasonable and valid claims." *In re Estate of Farr*, 150 Vt. 196, 199, 552 A.2d 387, 390 (1988).

¶ 29. As noted, § 1602 precludes a party from testifying in his or her own favor when the other party to the contract is dead, unless certain listed exceptions apply, including when the testimony is presented to meet or explain the testimony of living witnesses produced against him or her. Section 1603 is similar to § 1602 but applies only when an executor or an administrator is a party: "When an executor or administrator is a party, the other party shall not be permitted to testify in his own favor, unless the contract in issue was originally made with a person who is living . . . , except . . . to meet or explain the testimony of living witnesses produced against him." In this case, § 1603 applies because this dispute is between the co-administrators of the estates and the homeowners who allege that they had a contract with the decedents. See *Farr*, 150 Vt. at 198, 552 A.2d at 390.

¶ 30. ■ In addition to the exceptions to disqualification recognized in these statutes, this Court has recognized that the disqualification of testimony based on the dead man's statutes is waived if the party benefitting from the statutes acts inconsistently with the statutory disqualification by, for example, testifying in his or her own favor to the contract at issue or examining the disqualified party about the contract. *Id.* at 199, 552 A.2d at 390. The benefitting party must act consistently with the statutory disqualification "at all stages of the proceeding to avoid a finding of waiver." *Id.* (affirming trial court's finding of waiver where

party seeking benefit of disqualifying statute testified as to intent underlying contract in question). "Thus, failure to object in the probate court will be a waiver of the disqualification for all further proceedings." *Id.*

¶ 31. ■ With respect to the superior court's reliance on the dead man's statutes to exclude testimony by either of the co-administrators, that decision was erroneous for two reasons: neither of the co-administrators was a party to the alleged contracts and neither of them testified in their own favor. With respect to the co-administrators' testimony, this case is governed by *In re Estate of Maggio*, 2012 VT 99, 193 Vt. 1, 71 A.3d 1130. That case involved the terms of an agreement to dissolve a partnership between a decedent and a living party. The trial court ruled against the estate, in part based on interrogatory answers by the decedent's widow, and primary beneficiary, describing her understanding of the terms of the partnership dissolution between decedent and the other party. The decedent's widow appealed, arguing, among other things, that the trial court's reliance on her sworn testimony about the terms of the contract ran afoul of the dead man's statutes.

¶ 32. ■ We affirmed, ruling in relevant part that the dead man's statutes did not preclude admission of the widow's answers to interrogatories concerning her understanding of the terms of the dissolution of a partnership agreement between the decedent and his former partner for two independent reasons: the wife had not been a party to the agreement between her husband and his former partner, and the widow's answers to interrogatories were to her detriment rather than in her favor. *Id.* ¶ 19. The statutes bar testimony only by surviving parties to a purported contract, not other witnesses with knowledge of the agreement. *Id.* Moreover, the statutes preclude living parties to a contract with a decedent from testifying *in their own favor*, not from offering testimony against their own interests. *Id.*

¶ 33. Similarly, in this case, although the co-administrators are heirs to their parents' estates, neither of them was a party to the alleged oral contracts between Richard Hayes and the homeowners. Nor can their testimony regarding their father's promises to dedicate the infrastructure to the Town upon completion of the subdivision and to maintain the subdivision roads until that time be considered testimony in their favor. As noted above, Jeffrey

Hayes testified that he knew from his parents' arguments and from letters given to homeowners that his father had told the homeowners he would take care of the subdivision's roads, and Deborah Hayes-McGraw testified that her father told her he would maintain the roads until they were dedicated to the Town and that she knew her parents had made such promises to the homeowners in the subdivision. Because Jeffrey Hayes was not a party to the alleged oral agreements and neither he nor Deborah Hayes-McGraw testified in the estates' favor, the dead man's statutes did not bar their testimony concerning promises their father had made to homeowners about maintaining and dedicating the subdivision's infrastructure.[10] Thus, the superior court erred by excluding from consideration any of their testimony.

## B.

¶ 34. ■ We also conclude that the superior court erred by excluding testimony that the homeowners presented, or would have presented, concerning statements Richard Hayes made to them about maintaining and dedicating the subdivision's infrastructure. This testimony fits within the statutory exception of testimony made "to meet or explain the testimony of living witnesses produced against them" — in this case, the co-administrators. 12 V.S.A. § 1603. Although the co-administrators' testimony noted above was not made in their favor, the co-administrators were witnesses produced against the homeowners, and their testimony could be construed as establishing the full extent to which promises were made to the homeowners. Once the co-administrators broached the subject of promises made to the homeowners in their testimony, the homeowners had the right to meet or explain the nature and extent of those promises.

¶ 35. The homeowners' response to the co-administrators' testimony should not have been limited to testimony concerning Richard Hayes's general intentions concerning maintenance and dedication of the roadways. The co-administrators' testimony — including the testimony that should not have been excluded from

---

[10] Insofar as Deborah Hayes-McGraw testified that her father told her, in her capacity as a homeowner, that he would maintain the roads until they were dedicated to the Town, so that she was a party to that particular agreement, we do not rely on the rationale that she was not a party to the agreement in ruling that the dead man's statute did not apply. We note that the testimony was nonetheless contrary to her interests as co-administrator of the estates.

consideration by the superior court — opened the door under § 1603 to testimony concerning the scope and the details of specific promises made to specific homeowners about maintenance and dedication of the roadways. Cf. *Abbiati v. Buttura & Sons, Inc.*, 161 Vt. 314, 321-22, 639 A.2d 988, 992-93 (1994) (concluding that objection based on dead man's statutes waived where plaintiff opened door in her case-in-chief).

¶ 36. ■ Further, the superior court's erroneous decision to exclude from its consideration most of the co-administrators' and homeowners' testimony concerning promises that the Hayeses had made to the homeowners was plainly prejudicial. Disregarding that testimony, the court found no meeting of the minds as to those promises concerning real estate and thus refused to enforce the oral promises as an equitable exception to the Statute of Frauds. If the superior court had considered all of the testimony of the co-administrators concerning their parents' promises to homeowners, and the specific testimony of several homeowners indicating that they relied upon promises the Hayeses made to them about maintenance of the infrastructure pending its dedication to the Town, the court could have concluded that the equitable exception to the Statute of Frauds applied. See *In re Estate of Gorton*, 167 Vt. at 362, 706 A.2d at 951 (holding that court may enforce oral agreement for transfer of land where plaintiffs can show existence of agreement upon which other party knew plaintiffs had reasonably relied by irretrievably changing their position). Accordingly, the matter must be remanded for the superior court to consider the additional evidence and to determine anew whether there were enforceable promises concerning maintenance of the infrastructure pending its dedication to the Town.[11] The court may take additional evidence if necessary to arrive at an informed decision.

---

[11] As noted above, with respect to the water and sewer infrastructure, homeowners do not argue that Richard Hayes promised to maintain and dedicate this infrastructure; rather, they argue that he never disclosed to them in the first place that he continued to own this infrastructure, and led them to believe that the Town did. On remand, the trial court should consider the factual and legal issues surrounding homeowners' claims concerning the water and sewer infrastructure distinct from those relating to the roads.

## C.

¶ 37. ▮▮ Finally, the homeowners argue that the superior court failed to consider their promissory estoppel argument. The doctrine of promissory estoppel applies "where there is no contract, where the promise is gratuitous, and there is unbargained-for reliance." *Big G Corp. v. Henry*, 148 Vt. 589, 594, 536 A.2d 559, 562 (1987) (quotation omitted). At trial, the homeowners argued that they relied upon an oral promise as part of an agreement for the sale of real property. On remand, the superior court should address the homeowners' promissory estoppel argument as an alternative theory of recovery.

*Affirmed in part, reversed in part, and remanded for further proceedings concerning the homeowners' claims.*

