NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 41

No. 2017-079

| | |
|---|---|
| Jeffrey D. Hayes and Deborah Hayes McGraw | Supreme Court |
| v. | On Appeal from Superior Court, Bennington Unit, Civil Division |
| Mountain View Estates Homeowners Association | January Term, 2018 |

Katherine A. Hayes, J.

Eric G. Velto of Salmon & Nostrand, Bellows Falls, for Plaintiffs-Appellants.

Lon T. McClintock of McClintock Law Office, P.C., Bennington, for Defendants-Appellees.


PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1.    **ROBINSON, J.**   Developers of a residential subdivision died, leading to claims against their estates by the homeowners in the subdivision regarding the estates' responsibilities for the subdivision's private roads, water system, and sewer system. The estates appeal the trial court's decision that the estates were obligated, based on an agreement between the developers and the homeowners, to continue to maintain and repair the roads and water and sewer systems until the town accepted the dedication of the infrastructure. We affirm the court's findings and conclusions, and remand the matter to the trial court for remand to the probate division for further proceedings consistent with this decision.

I. Facts

¶ 2.    This is the second appeal to reach the Court in this matter. In the first appeal, we summarized the following basic facts, which are undisputed:

In the late 1970s and early 1980s, Richard Hayes developed a subdivision called Mountain View Estates on land jointly owned by him and his wife, Nadine Hayes, in the Town of Manchester. The subdivision grew to include forty residential homes, a school building, and a chiropractic clinic on forty-four lots. It is by now essentially built out, and no further sales of lots for additional building are likely.

The subdivision plan was approved by the Town and the state, and the water and sewer systems were permitted. The subdivision plan did not include any specific plans or requirements for dedication of its two privately owned roads or water and sewer systems to the Town. Richard Hayes initially supplied water to the subdivision through his water company, which he sold to the Town in 1982 along with the water and sewer lines underlying nine of the lots in the subdivision. Since then, the Town has supplied the water for the entire subdivision. The Hayeses continued to own the remaining portions of the subdivision's water and sewer systems, as well as the roadways, until they were simultaneously killed in a car accident in 2004. The sewer system includes underground lines and manholes that convey effluent by gravity to a pump station consisting of a holding tank and two submersible pumps. From the pump station, effluent is carried through an underground force main to the municipal sewer system, ending up at the Town's wastewater facility.

From the sale of the first lot in about 1981 until his death in 2004, Richard Hayes paid for maintenance and plowing of the roads that ran through the subdivision and maintained the subdivision's sewer system and the portion of the water system that he and his wife still owned, without charge to the homeowners.

Hayes v. Town of Manchester Water & Sewer Boards, 2014 VT 126, ¶¶ 2-5, 198 Vt. 92, 112 A.3d 742 (Hayes I).

## II.  Procedural History

¶ 3.    Following the Hayeses' deaths in 2004, a probate proceeding was opened and the Hayeses' adult children, Jeffrey Hayes and Deborah Hayes McGraw, were appointed co-administrators of their estates. The co-administrators sent a letter to the homeowners in the subdivision stating that effective immediately, the homeowners would be responsible for maintaining and plowing the subdivision's roads. The homeowners refused to assume responsibility for the road maintenance. They sought and were granted permission to intervene in the probate proceeding to protect their rights regarding the subdivision's road, water, and sewer

2

infrastructure.[1]  The estates have continued to maintain the roads and water and sewer systems at their own expense throughout this litigation.

¶ 4.    In September 2008, after a multiple-day hearing, the probate court ordered the estates to set aside $1 million to inspect the subdivision's water and sewer systems and make necessary updates and repairs, to dedicate the updated systems to the Town, and to pave the subdivision's roads and dedicate them to the Town.  The estates appealed to superior court.

¶ 5.    The superior court held a de novo trial over five days in August and November 2012.  The homeowners argued that the Hayeses made an oral agreement to maintain the roads at their own expense and to eventually pave them and turn them over to the Town.  They argued that the Hayeses never disclosed that the water system and sewer system were privately owned, and led them to believe that they were directly connected to Town-owned facilities.  The homeowners asked the court to order the estates to continue to pay for maintaining the infrastructure until the roads, water system, and sewer system were dedicated to and accepted by the Town, and to establish a constructive trust from the assets of the estates to fund maintenance and repairs.  In support of their claims, the homeowners pointed to a deed from the Hayeses to the Norses, which provided that the roadway would be maintained by the Hayeses until such time as it was turned over to the Town of Manchester.  The homeowners also presented testimony from individual homeowners concerning promises made by Richard Hayes regarding the maintenance and dedication of the roads and the provision of town water and sewer services.  The estates objected to the admission of this testimony on the ground that it was barred by Vermont's dead man's statutes, 12 V.S.A. §§ 1602-1603.

¶ 6.    Midway through the 2012 trial, the court ruled that testimony by any person regarding promises or commitments made by Richard Hayes to the homeowners, or statements he

---

[1]  The Town also filed a claim against the estates.  The superior court held that the Town was not entitled to any relief because it had no "claim," contingent or otherwise, against the estates as required by the probate statutes.  We affirmed the court's decision in Hayes I.  2014 VT 126, ¶ 17.  The Town is not a party to the present appeal.

made concerning financial responsibility for maintaining the infrastructure up to the time when it would be dedicated to the Town, were barred by the dead man's statutes. As a result, the superior court declined to consider the testimony of a number of homeowners that in agreeing to buy their properties they relied upon Richard Hayes's promises to maintain the roads and eventually dedicate them. The court also excluded statements by the co-administrators that they knew their father had promised the homeowners that he would maintain the roads. In the absence of this evidence, the court concluded that the homeowners had failed to prove the existence of an oral agreement by the Hayeses to maintain and repair the infrastructure. It therefore denied the homeowners' request for an order requiring the estates to pay for ongoing maintenance to the infrastructure, and vacated the probate court's order establishing a trust.

¶ 7.     The homeowners appealed, and we reversed. Hayes I, 2014 VT 126, ¶ 27. We held that the superior court improperly relied upon the dead man's statutes to exclude testimony by the co-administrators because neither of the co-administrators was a party to the alleged contracts between the Hayeses and the homeowners, and they did not testify in their own favor. Id. ¶ 33. We also held that the court erred by excluding the homeowners' testimony concerning specific promises Richard Hayes made to them about maintaining and dedicating the roadways. Id. ¶ 34. The co-administrators had opened the door to such testimony by discussing the promises made to the homeowners in their own testimony. The homeowners thus had the right to " 'to meet or explain the testimony' " of the co-administrators. Id. ¶ 34 (quoting 12 V.S.A. § 1603). We explained that the erroneous evidentiary ruling was prejudicial to the homeowners:

> If the superior court had considered all of the testimony of the co-administrators concerning their parents' promises to homeowners, and the specific testimony of several homeowners indicating that they relied upon promises the Hayeses made to them about maintenance of the infrastructure pending its dedication to the Town, the court could have concluded that the equitable exception to the Statute of Frauds applied.

Id. ¶ 36. We therefore remanded for the court to consider the excluded evidence and to determine whether the Hayeses made enforceable promises regarding the maintenance of the infrastructure.

4

¶ 8.     On remand, the trial court held a hearing at which the co-administrators testified. Based on this testimony and the testimony presented at the earlier trial, the court ruled in a January 2017 order that the homeowners had proved that they had an oral agreement with the Hayeses for the continued, permanent maintenance and repair of the infrastructure until the Town accepted the dedication of the infrastructure.  The court found that Richard Hayes promised to maintain and dedicate the roads and to provide the homeowners with Town water and sewer, and that the homeowners reasonably relied upon these oral promises, which were an essential part of their agreements to purchase their homes.  The promises were therefore enforceable under the equitable exception to the Statute of Frauds.

¶ 9.     The court concluded that in order to satisfy the estates' obligations, it was necessary for the estates to set aside funds in a trust to cover the reasonable cost of maintenance of the infrastructure until the estates were able to dedicate it to the Town.  Because no evidence was presented on remand as to the reasonable costs of such maintenance, "nor to determine what costs may now be necessary to ensure that the roads and system are accepted by the Town," the court remanded the matter to the probate division to determine the current assets of the estates and the amounts necessary to be set aside for maintenance, and "any order that is necessary to ensure that the roads and water/sewer system can be dedicated to the Town."  It ordered the estates to continue to pay for maintenance pending that hearing, which has not yet been held.

¶ 10.    The estates moved to alter or amend the judgment, arguing that the requirement of a trust constituted a windfall to the homeowners and the Town, that the Hayeses' promises to maintain the roads were not binding on the estates, and that the Hayeses never promised to maintain the water and sewer infrastructure or dedicate it to the Town.  The court denied the motion, and the estates filed this appeal.

III.  The Current Appeal

¶ 11.    As a threshold matter, we note that the superior court's January 2017 decision was not a final judgment because the matter was remanded to the probate division.  See Huddleston v.

5

Univ. of Vt., 168 Vt. 249, 251, 719 A.2d 415, 417 (1998) (explaining that court's order is not final unless it resolves controversy between parties); In re Cliffside Leasing Co., 167 Vt. 569, 570, 701 A.2d 325, 325 (1997) (mem.) (holding that environmental court's decision remanding matter to zoning board was interlocutory ruling). This is therefore an interlocutory appeal for which permission has not been sought. See V.R.A.P. 5(b) (requiring parties to seek permission of superior court before taking appeal from interlocutory decision). Pursuant to Vermont Rule of Appellate Procedure 2, we have discretion to suspend "application of Rule 5 where dismissal would most likely result in another appeal after remand, the merits of the question of law were fully briefed and argued, and the Court has expended valuable time on the case." In re Smith, 169 Vt. 162, 167, 730 A.2d 605, 609 (1999). Because these circumstances exist here, and because the remand to the probate court was limited to the factual issue of how much money should be set aside for maintenance of the infrastructure, we will consider the appeal.

¶ 12. We describe each of the estates' specific arguments on appeal in the body of this decision. The general legal framework that informs our analysis is as follows. Agreements concerning interests in land are controlled by the Statute of Frauds, and generally must be in writing to be enforceable. Chomicky v. Buttolph, 147 Vt. 128, 130, 513 A.2d 1174, 1175 (1986). However, there is an equitable exception to the requirements of the Statute of Frauds where the promisee has relied upon an oral agreement to the promisee's own detriment. In re Estate of Gorton, 167 Vt. 357, 362, 706 A.2d 947, 951 (1997). A court may enforce an agreement regarding an interest in land if the party seeking enforcement shows "that (1) there was an oral agreement (2) upon which they reasonably relied (3) by changing their position so that they cannot be returned to their former position, and (4) the other party to the agreement knew of such reliance." Id. Enforcement in these circumstances "is justified on the ground that repudiation by one party after the other has fully performed amounts to a virtual fraud." Id. at 361, 706 A.2d at 950 (citing Restatement (Second) of Contracts § 129 cmt. a (1981)).

6

¶ 13. We review a court's enforcement of an oral agreement regarding an interest in land for abuse of discretion. Nutting v. Freda, 153 Vt. 501, 501, 572 A.2d 896, 897 (1990) (mem.). We will uphold the court's findings unless they are clearly erroneous. Quenneville v. Buttolph, 2003 VT 82, ¶ 11, 175 Vt. 444, 833 A.2d 1263. "A trial court's findings of fact must stand unless, viewing the record in the light most favorable to the prevailing party and excluding the effect of modifying evidence, there is no credible evidence to support the findings." Hoover v. Hoover, 171 Vt. 256, 258, 764 A.2d 1192, 1193 (2000). As a general matter, "we will not reverse the trial court's underlying decision if the record before us reveals any legal grounds that would justify the result." Larkin v. City of Burlington, 172 Vt. 566, 568, 772 A.2d 553, 556 (2001) (mem.).

A. Water and Sewer Systems

¶ 14. The estates first claim that the superior court failed to make sufficiently distinct findings concerning the alleged agreement to maintain and dedicate the water and sewer systems, and thus violated this Court's direction on remand to "consider the factual and legal issues surrounding homeowners' claims concerning the water and sewer infrastructure distinct from those relating to the roads." Hayes I, 2014 VT 126, ¶ 36 n.11. They further argue that the evidence does not support the trial court's determination that there was an oral agreement regarding the water and sewer systems. Neither of these arguments is persuasive.

¶ 15. The trial court's findings were sufficient to allow us to understand and review its judgment that there was an oral agreement for the Hayeses to maintain the water and sewer systems until they were conveyed to the Town. See Trombly Plumbing & Heating v. Quinn, 2011 VT 70, ¶ 10, 190 Vt. 552, 25 A.3d 565 (mem.). The trial court found that the Hayeses promised to provide the homeowners with Town water and sewer services, and that these promises, along with the promises regarding road maintenance and dedication, "were an essential part of [the homeowners'] agreements to purchase their homes." It determined that the homeowners had reasonably relied on Richard Hayes's promises in purchasing their homes and could not now change their positions, and that Richard Hayes was aware of that reliance.

7

¶ 16.    Although the trial court's findings discuss the roads and the sewer and water infrastructure together for many purposes, the court's ultimate findings relating to the sewer and water system were supported by findings and evidence specifically related to the sewer and water system.    In particular, the court found that the homeowners understood that water and sewer services to their property were to be provided by the Town; that from the sale of the first lot in 1981 until his death in 2004, Richard Hayes maintained the water and sewer system that ran throughout the subdivision, including the pumping station, and did not charge any of the lot owners for these services; and that one of the co-administrators testified that her father told her that the Town was willing to accept the water and sewer system upon completion of the development and that when she acquired her own home in the development she believed that the roads and water and sewer system would be turned over to the Town in the future.

¶ 17.    These findings are supported by ample evidence in the record.    Multiple homeowners testified that at the time they purchased their properties, they believed that water and sewer services would be provided by the Town.  This belief was based on information provided to them by the Hayeses, the Town, or realtors.  Several homeowners testified that it was important to them to have public water and sewer services, as they did not want the responsibility of maintaining their own systems.  Two separate homeowners testified that they had previously lived in homes connected to private water and sewer systems, that they had found this to be a negative experience, and that they were therefore specifically looking for homes with connections to the municipal water and sewer system.  After purchasing their homes, the homeowners were billed by the Town for water and sewer services, supporting their belief that they were connected directly to Town-owned infrastructure.  The Hayeses never billed the homeowners for the upkeep of the water and sewer systems.  The homeowners were unaware until after the Hayeses' deaths that the Hayeses continued to own and maintain portions of the water and sewer system.  The estates presented no evidence to show that the homeowners were aware that the Hayeses owned portions of the water and sewer systems, or ever expected to pay directly for their upkeep.

8

¶ 18.    The above evidence supports the trial court's conclusion that the Hayeses promised to provide town water and sewer services and the homeowners relied on these promises in purchasing their homes.    The homeowners were led to believe that the water and sewer infrastructure was already owned by the Town.    The estates are correct in arguing that there is no evidence that the Hayeses ever expressly promised to <u>turn the water and sewer system over</u> to the Town—because the homeowners were led to understand that the Town owned them from the outset.    The homeowners never had reason to expect to ever pay for the upkeep of the water and sewer systems because they did not know the systems were privately owned.    Thus, implied in the Hayeses' agreement to provide town water and sewer services was an obligation for the Hayeses to maintain the privately owned portions of the system until the Town took them over so that the homeowners would continue to receive those services uninterrupted and at no cost.    See <u>Field v. Costa</u>, 2008 VT 75, ¶ 17, 184 Vt. 230, 958 A.2d 1164 (holding that court may read terms into agreement where "they arise by necessary implication" and are "indispensable to effectuate the intention of the parties" (quotation and emphasis omitted)).    The trial court therefore did not err in determining that the estates were subject to an oral agreement to maintain the water and sewer infrastructure until such time as it was dedicated to and accepted by the Town.[2]

## B.  Roads

### 1.  The Agreement to Maintain Roadways Runs With the Land

¶ 19.    We reject the estates' argument that Richard Hayes's promise to maintain the roads was personal to him and is not binding on the estates.

¶ 20.    In order to enforce a restrictive covenant against an owner other than the original covenantee, the covenant must run with the land.  <u>Rogers v. Watson</u>, 156 Vt. 483, 487, 594 A.2d 409, 411 (1991).  To run with the land, a covenant ordinarily must meet four requirements: it must

---

[2]  Because we affirm the court's decision that there was an oral agreement between the Hayeses and the homeowners to maintain the water and sewer systems, we need not address the estates' arguments that promissory estoppel does not apply.

be in writing, the parties must intend that the promise run with the land, it must "touch and concern" the land, and there must be privity of estate between the parties. Id. (quotation omitted). The requirement of a writing may not be necessary where, as here, the beneficiary of the promise has changed position in justifiable reliance on that promise. See Restatement (Third) of Property: Servitudes § 2.9 (explaining that servitude may be enforceable despite noncompliance with Statute of Frauds "if the beneficiary of the servitude, in justifiable reliance on the existence of the servitude, has so changed position that injustice can be avoided only by giving effect to the parties' intent to create a servitude").

¶ 21.    The only element challenged by the estates is the intent requirement. The estates argue that there was no evidence that the Hayeses intended their promise to run with the land. They focus on the language in the deed from the Hayeses to the Norses, which states: "Maintenance of the roadway will be maintained by the Grantor until such time as the roadway is turned over to the Town of Manchester." The estates argue that because the deed did not include language binding the Hayeses' heirs or assigns, the promise to maintain the roads was a personal covenant, enforceable only against the Hayeses and not their estates.

¶ 22.    The parties' intent for a covenant to run with the land may "be implied as well as expressed," and may be demonstrated by "extraneous circumstances." Rogers, 156 Vt. at 488, 594 A.2d at 411. "Some promises are so intimately connected with the land as to require the conclusion that the necessary intention for the running of the benefit is present absent language clearly negating that intent." Albright v. Fish, 136 Vt. 387, 393, 394 A.2d 1117, 1120 (1978). Examples include covenants not to subdivide land into lots smaller than a certain size, see id.; to maintain the land open and free of buildings and structures, see Gardner v. Jefferys, 2005 VT 56, ¶ 7, 178 Vt. 594, 878 A.2d 259 (mem.); and to build and maintain fences on the land, see Kellogg v. Robinson, 6 Vt. 276, 282 (1834).

¶ 23.    Like these promises, the Hayeses' promise to maintain the roadways until they were turned over to the Town is a promise "so intimately connected with the land" that the trial court

10

could reasonably infer the necessary intention to run with the land. <u>Albright</u>, 136 Vt. at 393, 394 A.2d at 1120. The evidence is consistent with this inference. From the time they sold the first lot, the Hayeses maintained the roads at their own expense for over twenty years until their deaths in 2004. There was no evidence that they ever—either before or after conveying all of the properties at issue in this case—expressed an intent to limit the road maintenance to their lifetimes. They never made any provision for a homeowners' association to take over the roads. And there is no other evidence undermining the inference that they intended the covenant to run with the land. On this record, the trial court's conclusion that the covenant to maintain the infrastructure ran with the land is supported.

2. The Estates Are Bound To Maintain The Roads Unless and Until the Town Accepts Them

¶ 24.    We further reject the argument that Richard Hayes only promised to maintain the roads until they were <u>offered to</u> the Town, and that the court's order exceeded the scope of that promise because the court ordered the estates to pay for upkeep until the Town <u>accepted</u> their dedication of the roads.

¶ 25.    The court's interpretation of the scope of the parties' agreement is supported by the evidence. The testimony presented at trial showed that the Hayeses intended for the Town to eventually assume ownership and control of the roads. Deborah Hayes testified that her father intended to maintain the roads until they were turned over to the Town, and the Town had indicated to him that it was willing to accept them. Jeffrey Hayes testified that his father intended to dedicate the roads to the Town once the development was complete. Two homeowners testified that the Hayeses told them that they planned to sell all of the lots in the subdivision, at which point the roads would be "turned over" to the Town. And as noted above, in the Norse deed, the Hayeses promised to maintain the roads until they were "turned over" to the Town of Manchester.

¶ 26.    The plain meaning of "turn over" in this context is to deliver or surrender, that is, to transfer ownership. See Webster's New Collegiate Dictionary 1262 (1977) (defining "turn over" as "deliver, surrender"); American Heritage Dictionary 1384 (1979) (defining "turn over"

11

as "[t]o transfer to another; give over"). The process of transferring ownership of a road from private hands to a town requires dedication by the owner and acceptance by the town. Demers v. City of Montpelier, 120 Vt. 380, 384-85, 141 A.2d 676, 679-80 (1958) (explaining that to transfer private property to public domain, there must be dedication by landowner and affirmative acceptance by public authority). A mere offer of private property is insufficient: "The clearest or most unequivocal act of dedication would be wholly ineffectual without an acceptance of the dedication by the town, acting through its proper officers." Kirkland v. Kolodziej, 2015 VT 90, ¶ 35, 199 Vt. 606, 128 A.3d 407 (quoting Folsom v. Town of Underhill, 36 Vt. 580, 587 (1864)). Thus, in order to effectuate the Hayeses' promise to the homeowners, the court properly required the estates to maintain the roads until the Town accepted the dedication.

¶ 27. Our determination does not improperly supply a missing contract term. The estates argue that the homeowners have already received thirty years of free road maintenance, and that the court's order requiring the estates to continue to pay for road maintenance indefinitely "impermissibly fills a contract void with a duration it had already found to be unreasonable." The estates' argument fails because it is based upon the trial court's 2013 decision, which erroneously interpreted the dead man's statutes to require exclusion of significant portions of the parties' testimony, and therefore concluded no contract existed. In its 2017 decision, the court considered the excluded testimony and found that the parties had in fact agreed that the Hayeses would provide free road maintenance until they dedicated the roads to the Town, an event that the Hayeses expected to occur sometime after the subdivision was fully developed. This contract therefore did not lack a reasonable termination date. See Haines v. City of New York, 364 N.E.2d 820, 822-23 (N.Y. 1977) (holding that "reasonable time" for performance of 1924 agreement in which city agreed to construct and maintain sewer system for village and town to prevent sewage from entering city's water supply was until city no longer needed or used the water supply).

12

## C.  The Effect of the Town's Pre-Conditions To Acceptance

¶ 28.    The estates claim that the Town will not accept the roads, water system, and sewer system unless the estates make significant upgrades.  They reason that the court's order, which they characterize as a "forced dedication," necessarily requires them to pay for the upgrades, and there was no evidence that the Hayeses promised to make such improvements prior to turning the infrastructure over to the Town of Manchester.  Thus, they claim, the court's order requires more of the estates than the Hayeses ever promised or contemplated, creates an unjust windfall to the Town and the homeowners, and must be reversed.[3]

¶ 29.    These arguments do not warrant reversal of the superior court's decision.  First, the trial court's order addressed only the agreement between the Hayeses and the homeowners.  The Town is no longer a party, and its alleged conditions for acceptance of the infrastructure are outside the scope of the current appeal.  Contrary to the estates' repeated assertions, the court did not order them to dedicate the infrastructure to the Town.  Rather, it ordered the estates to bear the costs of maintaining the roads and other infrastructure until such time as they were dedicated to and accepted by the Town.  The estates could retain the infrastructure and continue to bear the maintenance costs indefinitely should they choose to do so.

¶ 30.    The order also does not create an unjust windfall for the homeowners.  It ensures that the homeowners will receive what the Hayeses promised to deliver in order to encourage them to purchase their homes: the roads will be maintained at no expense to them, and they will continue to receive municipal water and sewer services at no cost beyond that assessed by the municipality.  Aside from helping the Hayeses to sell homes in the subdivision, the Hayeses reaped other benefits

---

[3]  The estates also assert that the court's order is a forced dedication that amounts to a taking in violation of Chapter I, Article 2 of the Vermont Constitution.  We decline to directly address this claim, as it was not briefed or argued below.  See State v. Ovitt, 2005 VT 74, ¶ 13, 178 Vt. 605, 878 A.2d 314 (mem.) ("An issue is not preserved for appeal unless a party raises it with specificity and clarity below, thereby ensuring that the trial court will have an opportunity to fully develop the relevant facts and to reach considered legal conclusions.").  However, our analysis of the related claims would be pertinent to this claim as well.

from this bargain. Co-administrator Jeffrey Hayes testified that the Hayeses delayed dedicating the roads, water system, and sewer system to the Town because they wanted to be able to dig up the road to install new services for lots that were sold without having to request permission from the Town each time. In exchange for this flexibility, the Hayeses chose to maintain the roads and infrastructure themselves and never attempted to dedicate them to the Town. They therefore accepted their continuing obligations to the homeowners.

## D. Remedy

¶ 31. The superior court did not abuse its discretion in ordering the probate division to establish a trust using estate funds for maintenance of the roads, water system, and sewer system. As discussed above, the court concluded that there was an oral contract between the Hayeses and the homeowners in which the Hayeses agreed to maintain the roads, water system, and sewer system at their own expense until the infrastructure was dedicated to and accepted by the Town. The court's conclusion was supported by its findings, which in turn are supported by the record. See supra, ¶¶ 14-27. The homeowners have therefore established a claim for which the court could establish a trust pursuant to 14 V.S.A. § 1210(b)(2). See Hayes I, 2014 VT 126, ¶ 17 ("[T]he word 'claim' in statutes that establish deadlines for filing claims in probate proceedings generally means those obligations which are in the broad sense of the term, debts and would include obligations arising out of contract express or implied." (quotation omitted)). The statute permits the court to establish a trust to ensure that funds are available to meet the continuing obligations of the decedents under the oral agreements. 14 V.S.A. § 1210(b)(2) ("[A]rrangement for future payment, or possible payment, on the happening of the contingency or on liquidation may be made by creating a trust, giving a mortgage, obtaining a bond or security from a distributee, or otherwise.").

¶ 32. We agree with the estates that the trust established by the probate court does not necessarily have to include sufficient funds to make the improvements necessary for the successful dedication of the infrastructure to the Town, as long as it is sufficient to satisfy the trial court's order that the estates are obligated to provide for the continued, permanent maintenance and repair

14

of the roads, water system, and sewer system until such time as the Town of Manchester accepts the dedication. In other words, if the cost of improvements necessary to dedicate the infrastructure is prohibitive, the estates have the option to maintain the infrastructure at their own expense indefinitely, and to establish a trust sufficient to finance such indefinite maintenance of the roads, water system, and sewer system. We conclude that these alternatives are implicit in the trial court's order requiring that the trust be sufficient to satisfy the estates' obligations to provide for the continued, permanent maintenance of the infrastructure until the Town accepts the dedication.

We affirm the superior court's findings and conclusions and remand the matter to the superior court so that it can remand to the probate division for further proceedings consistent with this decision.

FOR THE COURT:

_____

Associate Justice